**IRVING MATERIALS, INC., Plaintiff–Counterdefendant,**

v.

**COAL, ICE, BUILDING MATERIAL AND SUPPLY DRIVERS, HEAVY HAULERS, WAREHOUSEMEN AND HELPERS, LOCAL 716, Kenneth Sutton, its President, and John Marshall, one of its Business Agents, Defendants–Counterclaimants.**

**No. IP 91–408–C.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

Jan. 3, 1992.

Stephen C. Cline, Susan E. Traynor, Cline Owen & Kinzie, Indianapolis, Ind., for plaintiff-counterdefendant.

Fred O. Towe, Fillenwarth Dennerline Groth & Towe, Indianapolis, Ind., for defendants-counterclaimants.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

McKINNEY, District Judge.

This matter, which raises questions about the power of arbitrators in the labor grievance process, is before the Court on motions for summary judgment by the plaintiff-counterdefendant Irving Materials, Inc. ("Irving" or "the company"), and the defendants-counterclaimants, Coal, Ice, Building Material and Supply Drivers, Heavy Haulers, Warehousemen and Helpers Local 716 (the "Union" or "Local 716"), Local 716 president Kenneth Sutton ("Sutton"), and Local 716 business agent John Marshall ("Marshall"). Jurisdiction and venue are proper, and both motions are ready for resolution.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The relevant facts are not in dispute.[1] On January 19, 1990, Fred Morris, a member of Local 716 and a cement truck driver for Irving, collided with a Conrail train at a railroad crossing some 200 feet south of the entrance to Irving's plant in Greenfield, Indiana. Morris was heading north at 40 miles per hour and failed to see the train, which was approaching from the east, until his truck was approximately 80 feet from the track. Morris, unable to stop, swerved to the left as he passed through the crossing, but failed to clear the track before being hit by the train. The collision caused estimated damage of $15,000. A deputy sheriff who examined the scene concluded that Morris's negligence and inattentiveness caused the accident, and that Morris violated Indiana law by failing to yield to the train. The deputy issued no ticket, however, apparently because he did not witness the accident first-hand.

Irving promptly discharged Morris. In a letter dated January 19, 1990, the company wrote:

> This is your third major accident in two years. In January 1988 you turned your truck over on 96th Street causing $5,000 damage to your truck. In August of 1989 you rear-ended a stopped car on I-465 causing $9,734.79 in damages. This latest accident will cost in excess of $15,-000 in damages.
>
> The police reported [sic] on this accident indicates a high degree of negligence, disregard of safety rules, careless handling of Company equipment, and/or willful damage to Company equipment. In addition, an inspection of your truck reveals that you have added sunscreen to all windows and your windows are so dirty it is difficult to see out of them. These practices also indicate a high degree of negligence and disregard of safety rules.
>
> We are concerned about your personal safety and the safety of the driving public as you are unable to operate a truck safely. [Irving] is exposed to tremendous liability if we continue to allow you to drive one of our trucks. Therefore, we are hereby dismissing you effective January 26, 1990, based on our work rules.

*See* Opinion and Award of Arbitrator Gil Vernon at 2 [hereinafter "Award"] (quoting from letter). In terminating Morris, Irving apparently relied on two provisions of the collective bargaining agreement (the "Agreement")[2] it had with Local 716: a clause requiring employees to observe cer-

---

1. The Court derives its factual summary from the parties' pleadings, as elaborated by the findings of arbitrator Gil Vernon in his Opinion and Award of April 3, 1991 (a copy of which was attached as Exhibit B to Defendants' Memoran- dum in Support of Motion for Summary Judgment).

2. The Agreement went into effect April 1, 1989 and expires at midnight March 31, 1992.

tain safety regulations pertaining to tools and equipment;[3] and a clause stating that Irving retained all "rights of the traditions of management" not specifically limited by the Agreement.[4] The company, despite referring to Morris's 1988 and 1989 accidents in its letter, had never disciplined him in any way for these incidents, and did not precede his discharge with any "progressive discipline"—e.g., a suspension or written warning—as required by the Agreement.[5]

Shortly after Morris received the letter, the Union filed a grievance in accordance with procedures outlined in the Agreement,[6] claiming that Morris was discharged without just cause[7] or proper warning,[8] and that he therefore was entitled to reinstatement and back wages. Irving and the Union could not resolve the grievance, and it ultimately was referred to arbitration.[9]

**3.** Article XVI, Section 3 of the Agreement states, in relevant part:

All equipment and tools shall be maintained in a safe and efficient working order and regulations and safety codes adopted by appropriate federal and state agencies, in the interest of protecting health and safety of employees as they affect this industry, shall be strictly observed by both the employers and the employees.

Although Irving referred to "our work rules" in its letter to Morris, it has not asserted in this action that Morris violated any specific company-made rules. *See infra* note 8.

**4.** Article XXV of the Agreement states:

All of the traditions of the management of the business and the direction of the work force which are not specifically limited by the expressed language of this Agreement are exclusively vested in and retained by the Employer.

**5.** Article XVII, Section 2 states: "The Employer and the Union recognize the principle of progressive discipline. A disciplinary measure more than twelve (12) months old shall be removed from an employee's record."

**6.** Article XXIII of the Agreement outlines the proper grievance procedure, and states in part:

When any question arises between an employee and the Employer or between the Employer and the Union, concerning the meaning and application of the terms of this Agreement, which cannot be satisfactorily settled with the employee's foreman or supervisor ... such question shall be settled in accordance with the following grievance procedure:

The employee affected, the Union or the steward shall reduce the question to writing on the form furnished by the Union within five (5) working days of the day that the employee knew, or by the exercise of reasonable diligence should have known, of its occurrence. The employee, the Union or the steward shall then take up the question with the foreman, or supervisor (if the Employer has such representative), or with the Employer directly. Failing satisfactory adjustment, the question shall then be taken up within a further period of five (5) working days between the Employer and a representative of the Union. Failing satisfactory adjustment within ten (10) working days from the time of

discussion between the Employer and the Union, any question as to the meaning, interpretation, or application of the provisions of this Agreement, shall be referred to arbitration....

Agreement, Article XXIII, Section 1 (attached as Exhibit A to Plaintiff's Complaint to Vacate Arbitrator's Award).

**7.** Article XVII, Section 2 of the Agreement states in part:

No employee shall be disciplined or discharged except for just cause.... Any employee who is subject to disciplinary action under this Section shall receive written notice of such within five (5) scheduled working days after the Employer is made aware of the infraction, with a copy going to the employee, steward and the Union. Failure on the part of the Employer to issue such notice will result in the disciplinary action being voided.

**8.** In addition to alleging a lack of required progressive discipline, the Union claimed that the "safety rules" supposedly disregarded by Morris, insofar as they were rules made by Irving, did not comply with the notice requirements of the Agreement:

The Employer shall have the right to make rules from time to time, provided, that no rule shall be effective unless:

(a) A copy has been previously sent to the offices of the Union.

(b) It has been posted.

(c) It is not in violation of the terms of this Agreement.

(d) It is reasonable.

It is understood that the Union has the right to grieve on the question of whether or not a rule violates the terms of this Agreement or is unreasonable. In connection with a grievance against a penalty imposed by the Employer for the violation of a rule, the Union shall have the right to raise the question of whether or not the rule is in violation of this Agreement or is unreasonable as well as whether or not the employee violates the rule and whether the penalty imposed by the Employer is proper.

Agreement, Article XVI, Section 4.

**9.** Article XXIII, Section 2 of the Agreement states:

The parties selected Gil Vernon to decide the dispute, and he conducted a full hearing on December 13, 1990.

Vernon's decision, issued on April 3, 1991, focused on two questions: (1) whether Morris was "guilty of the misconduct with which [he was] accused," and (2) if yes, whether "the punishment fit the crime." Award at 11. In dealing with the first question, Vernon initially found that the evidence did not support a conclusion that Morris caused "willful damage to Company equipment" as charged in the company's discharge letter. Vernon went on to determine, however, that Morris's inattentiveness and consequent failure to see the train did demonstrate a "high degree of negligence."[10] According to Vernon, this degree of negligence did not rise to the level of gross negligence, recklessness, or a willful disregard of safety; on the other hand, it constituted "something more serious" than simple negligence. Award at 12.

The second question—whether Morris's misconduct warranted termination—required greater consideration. Vernon first addressed Irving's three asserted justifications for its decision to discharge Morris: (1) the threat of a "willful retention" suit by the driver of the car involved in Morris's July 1989 accident; (2) a possible loss of insurance coverage; and (3) Morris's past record of accidents in company vehicles.[11] Vernon dismissed these rather quickly,

stating that no real threat of a negligent retention suit had been shown, and that evidence which suggested that Irving might lose insurance coverage—a letter from an agent—was not probative because the agent was inclined to say whatever Irving wanted. Vernon also concluded that Irving had "waived its right to attach any disciplinary consequence" to Morris's previous accidents, because it had not imposed timely discipline for them. *See* Award at 13–14.

Vernon then discussed Irving's failure to adhere to progressive discipline. Irving admitted that it had not followed the Agreement's requirement for progressive discipline, but claimed that Morris's conduct was serious enough to warrant immediate termination. Vernon conceded that some offenses—"theft, punching out a supervisor, etc."—might justify immediate discharge, but noted that other offenses, such as negligence, "vary in ... seriousness" and "because of varying circumstances, might warrant immediate discharge in one instance but require a warning/suspension prior to discharge in another." While acknowledging that it was a "difficult call to make," Vernon concluded that the circumstances did not justify immediate discharge in this case. Vernon stated that he was led to this conclusion by the fact, "more than any other," that "the Company has benignly condoned, if not blatantly tolerated, carelessness on the part of [Morris], as well as

---

Either party may refer the question involved to arbitration by written notice to the other within the ten (10) working days from the discussion between the Employer and a representative of the Union. When such written notice is given, the Employer and the Union shall seek to agree upon an arbitrator. If they fail to agree within five (5) working days from the date of said written notice, they shall jointly request the Federal Mediation and Conciliation Service to furnish a list of five (5) persons qualified to act as an arbitrator from which list they shall alternately strike until one remains. The person whose name remains shall be appointed the arbitrator.

**10.** Specifically, Vernon stated:

In the Arbitrator's opinion, for a professional driver not to notice something as big and bright as two blue locomotives moving along with several cars, is a high degree of negli-

gence. While there were no lights at the crossing and while the horn/whistle might not have been detectable in the cab of the cement mixer, it still is difficult to understand why a reasonably attentive driver would not have noticed the engine *or at least noticed that other traffic was stopped at the crossing.* The Union is right that [Morris] is guilty of only inattentive driving, but under these circumstances, this demonstrates a high degree of negligence.

Award at 12 (emphasis in original) (footnote omitted).

**11.** Irving also urged Vernon to sustain the discharge on the ground that Morris's negligence constituted a violation of law. Vernon dismissed this ground because it was not mentioned in the discharge letter, and because Morris was not cited for any violation stemming from the accident. Award at 12 n. 1.

other employees, in the past." By failing to discipline Morris for the earlier accidents, Irving sent the message that "[t]here was no penalty for negligence." Morris, therefore, had been discharged without just cause. *Id.* at 14–15. Still, Vernon felt that Morris bore some responsibility for the accident, so he ordered a ten day suspension and conditioned Morris's reinstatement on the "successful completion of a remedial/defensive driving skills course and the presentation of a valid license necessary to operate the Company's truck." *Id.* at 17.

On April 17, 1991, Irving filed its complaint in this Court to vacate the arbitrator's award, pursuant to § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, and the Arbitration Act, 9 U.S.C. § 10(d). The Union, Sutton, and Marshall counterclaimed for enforcement of the award on May 24, 1991. Irving moved for summary judgment on July 2, 1991, on grounds that (1) Vernon, by ordering Morris's reinstatement despite agreeing that he had demonstrated a high degree of negligence, exceeded his powers as arbitrator under the collective bargaining agreement, and (2) the award, even if properly made, nevertheless violated public policy. The defendants responded by filing their own motion for summary judgment on August 1, 1991.

## II. DISCUSSION

### A. *Summary Judgment Standard*

Motions for summary judgment are governed by Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

When the standard embraced in Rule 56(c) is met, summary judgment is mandatory. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). As stated in *Celotex,* summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555. Decisions of the Seventh Circuit are in conformity with this view. *See, e.g., Patrick v. Jasper County,* 901 F.2d 561, 565 (7th Cir. 1990); *Spellman v. Commissioner,* 845 F.2d 148, 151–52 (7th Cir.1988).

Moreover, the mere existence of a factual dispute is not by itself sufficient to bar summary judgment; the disputed fact must be outcome determinative. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *International Bhd. of Boilermakers v. Local D354,* 897 F.2d 1400, 1406 (7th Cir.1990). Irrelevant or unnecessary facts do not preclude summary judgment even when in dispute. *Clampitt v. Ft. Wayne,* 682 F.Supp. 401 (N.D.Ind.1988), *aff'd,* 864 F.2d 486 (7th Cir.1988). In this case, the parties do not dispute the relevant facts, and all agree that summary judgment is appropriate.

### B. *Review of Arbitrator's Decision*

#### (1) General Considerations

When parties agree to submit labor contract interpretation disputes to arbitration, the arbitrator's decision "binds the court asked to enforce the award or to set it aside." *Chicago Typographical Union v. Chicago Sun–Times,* 935 F.2d 1501, 1505 (7th Cir.1991) (citations omitted). As the Supreme Court has stated:

> [C]ourts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract. The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be under-

mined if courts had the final say on the merits of the awards.'

*United Paperworkers v. Misco*, 484 U.S. 29, 36, 108 S.Ct. 364, 370, 98 L.Ed.2d 286 (1987) (quoting *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960)). As a result, a court "is forbidden to substitute its own interpretation even if convinced that the arbitrator's interpretation was not only wrong, but plainly wrong." *Chicago Typographical*, 935 F.2d at 1505; *see also E.I. DuPont de Nemours v. Grasselli Employees Indep. Ass'n*, 790 F.2d 611, 614 (7th Cir.), *cert. denied*, 479 U.S. 853, 107 S.Ct. 186, 93 L.Ed.2d 120 (1986). This deferential approach embodies the statutory law's "decided preference for private settlement of labor disputes without the interference of government." *Misco*, 484 U.S. at 37, 108 S.Ct. at 370. Consequently, courts will be obliged to enforce most of the arbitration awards they review.

■ Absolute deference is not required, however. Case law indicates that a court may refuse to enforce an arbitration award in three narrow situations: (a) when the dispute arguably was not arbitrable, or was submitted to the arbitrator improperly or prematurely, *Sheet Metal Workers Local 20 v. Baylor Heating*, 877 F.2d 547, 551 (7th Cir.1989); (b) when the award violates, or fails to "draw its essence from," the governing collective bargaining agreement, *Enterprise Wheel & Car*, 363 U.S. at 597, 80 S.Ct. at 1361; *Chicago Typographical*, 935 F.2d at 1505; or (c) when enforcement of the award would violate public policy. *Misco*, 484 U.S. at 42–45, 108 S.Ct. at 373–74; *W.R. Grace & Co. v. Local Union 759, United Rubber Workers*, 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983). Irving does not claim that its disagreement with the Union was not arbitrable or was submitted to arbitration improperly; the company does claim, however, that the remaining two grounds apply here and require vacation of the award. The Court will address each of these grounds in turn.

### (2) Violation of the Agreement

■ Most suits seeking the vacation of arbitration awards try to show that the arbitrator failed to base his award on the governing collective bargaining agreement, thereby exceeding his authority. In general:

> [A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of an award.

*Enterprise Wheel & Car*, 363 U.S. at 597, 80 S.Ct. at 1361; *see Chicago Typographical*, 935 F.2d at 1505. Arbitration clauses generally limit arbitrators to interpreting the agreements of which they are part; as a result, arbitrators can exceed their authority by basing awards on personal views, *Chicago Typographical*, 935 F.2d at 1505, or on positive law not invoked by the agreements, *Roadmaster Corp. v. Production & Maintenance Employees Local 504*, 851 F.2d 886, 888–89 (7th Cir.1988), or by imposing terms clearly not contemplated by the parties. *See Sheet Metal Workers*, 877 F.2d at 555–56. On the other hand, arbitrators typically may refer to sources outside the agreement, such as their own experiences or the "industrial common law," in interpreting difficult or ambiguous provisions. *See United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 581–82, 80 S.Ct. 1347, 1352–53, 4 L.Ed.2d 1409 (1960); *Tootsie Roll Indus. v. Local Union No. 1, Bakery, Confectionery & Tobacco Workers*, 832 F.2d 81, 84 (7th Cir.1987) (noting limited circumstances in which this is allowed). Despite these general rules, however, it is increasingly clear that an arbitrator can do nothing beyond what he is empowered to do by the collective bargaining agreement. The validity of a given award therefore will depend on whether the arbitrator has complied with the express stipulations of the

parties, who are free to restrict or expand arbitrator authority beyond usual norms. *See Chicago Typographical,* 935 F.2d at 1505.

#### (a) Just Cause

Irving's first claim that Vernon exceeded his authority rests on three assumptions: (a) that Vernon found Morris "guilty of the misconduct with which he was charged," i.e., a high degree of negligence; (b) that a high degree of negligence constitutes just cause for discharge under the Agreement; and (c) that Vernon, having found just cause, had no choice but to uphold the company's termination decision. The first assumption is correct; it is clear that Vernon found Morris "guilty" of a "high degree of negligence." The second assumption, however—and by derivation the third—is not supported by the language of the Agreement.

■ Vernon had substantial discretion to interpret and apply the Agreement, so long as he did not "add to, subtract from, or in any way modify" its terms. Agreement, Article XXIII, Section 3. Because it had no express limitations,[12] this power included the authority to determine just cause— "[p]erhaps the single most significant and common issue to which [judicial] deference extends." *See Florida Power Corp. v. International Bhd. of Elec. Workers, Local 433,* 847 F.2d 680, 681–82 (11th Cir.1988) (citing several cases). Vernon therefore possessed broad discretion to determine the existence of just cause for Morris's discharge. *See Crafts Precision Inds. v. Lodge No. 1836, Int'l Ass'n of Machinists,* 889 F.2d 1184, 1185–86 (1st Cir.1989); *see also DuPont,* 790 F.2d at 614–15 (upholding arbitrator, because "mere disagreement does not allow an overturning of the award"). Given the scope of his power,

Vernon's determination that Morris was discharged without just cause—despite finding a high degree of negligence—was entirely proper, because it was his decision to make. *See Crafts Precision,* 889 F.2d at 1185–86 (upholding arbitrator's reversal of termination for violation of shop rule, because agreement, although stating that violation *could* result in discharge, did not state that it *would* result in discharge).

■ The sections of the Agreement relied on by Irving do not affect this conclusion. It is true that Irving retained all management and workforce direction rights "not specifically limited" by the Agreement, but this did not constitute a reservation of the right to determine just cause, and could not overcome Vernon's general authority to interpret the Agreement. In addition, the Agreement does not list specific acts or conduct—negligence included—that constitute just cause for discharge; in fact, it does not define "just cause" at all. *See* Agreement, Article XVII, Section 2.[13] Vernon therefore had no contractual limits or mandates as to what specific incidents "just cause" would or would not include. *See Litvak Packing v. United Food & Commercial Workers, Local No. 7,* 886 F.2d 275, 276 (10th Cir. 1989) (upholding arbitrator's finding that employee's "carelessness, laziness, and neglect, none of which are mentioned specifically" in agreement, "did not constitute just and sufficient cause" to fire the employee).

■ In addition, Irving's repeated assertions that Vernon found Morris guilty of "disregard[ing] safety rules" are without merit. First, the Court cannot find such a holding anywhere in Vernon's award. Second, Irving has cited no specific company

---

**12.** Parties may limit an arbitrator's authority by expressly removing the just cause determination from his scope of authority, *see International Bhd. of Elec. Workers v. Sawnee Elec. Membership Corp.,* 862 F.2d 1534, 1536 (11th Cir.1989), or by enumerating the specific items that will constitute just cause. *See Delta Queen Steamboat Co. v. District 2 Marine Eng'rs Beneficial*

*Ass'n,* 889 F.2d 599, 601 (5th Cir.1989), *cert. denied,* —— U.S. ——, 111 S.Ct. 148, 112 L.Ed.2d 114 (1990). Neither limitation is present in the Agreement here.

**13.** The only possible exception is found in Article XVII, Section 3, which states that "[n]o em-

rules that Morris's actions violated.[14] Finally, Irving appears to take the section of the Agreement stating that "all employees shall strictly observe all applicable federal and state safety regulations" out of proper context. The quoted section (Article XVI, Section 3) seems narrowly to invoke federal and state safety codes that pertain to the maintenance of tools and equipment. *See supra* note 3. Irving apparently reads the provision broadly, to include local traffic laws as they may apply to an employee's operation of "vehicular equipment." While this interpretation is not totally implausible, Vernon was within his authority to interpret the section more narrowly, and to conclude that it did not apply to Morris's case.

The cases cited by Irving do not command a different result. In *Ballwin–Washington, Inc. v. International Ass'n of Machinists*, 615 F.Supp. 865 (E.D.Mo. 1985), the collective bargaining agreement provided that an employee's violation of a contractual "three day—no report" rule would provide the employer with just cause for dismissal; in fact, termination was the company's exclusive remedy. The company discharged an employee who violated the rule, but an arbitrator found that the violation was unintentional and rescinded the discharge. The district court vacated this award, holding that the agreement "clearly state[d] that termination is the sole disciplinary action available for violation" of the rule, and that the arbitrator, having found a violation (intentional or not), had no choice but to affirm the company's decision. *Id.* at 870. Similarly, in *Florida Tel. Corp. v. Communication Workers of Am.*, 475 F.Supp. 213 (M.D.Fla. 1979), the arbitrator found that "the employer had just cause ... to impose a severe penalty" on an employee who had committed an act specified in the agreement as constituting cause for discharge. *See id.* at 214–15 and n. 1. Nevertheless, the arbitrator reduced the discharge to a suspension. The district court, although acknowledging the arbitrator's general power to review disciplinary actions, held that he could not reduce the company's choice of penalty once he found that just cause existed, because the governing agreement placed discretion to impose penalties "solely and exclusively in the company." *Id.* at 216.

■ *Ballwin–Washington* and *Florida Telephone*, while informative, are distinguishable from Morris's situation, because the arbitrators in those cases found that the discharged employees had engaged in conduct which, by express terms of the governing agreements, justified their termination. The arbitrator's findings therefore constituted "implicit" conclusions that just cause existed. *See Delta Queen Steamboat Co. v. District 2 Marine Eng'rs Beneficial Ass'n*, 889 F.2d 599 (5th Cir. 1989) (stating that "should the arbitrator 'implicitly find' that proper cause exists, he need not recite the operative phrase"), *cert. denied,* —— U.S. ——, 111 S.Ct. 148, 112 L.Ed.2d 114 (1990). Here, in marked distinction, the Agreement specifies no acts or offenses that constitute just cause for discharge, and Vernon expressly found that no just cause existed. Vernon's decision that Morris showed a high degree of negligence, therefore, did not equal an implicit finding that Morris was terminated for just cause.

### (b) Reference to Other Employees

Irving also claims that Vernon exceeded his authority by basing his award on "the fact that the Company ... benignly condoned, if not blatantly tolerated, carelessness on the part of [Morris], as well as other employees, in the past." *See* Award at 15. According to Irving, this statement shows that Vernon improperly reached a decision based on how the company has treated other employees in past similar situations, rather than on the Agreement. In support of this position, Irving cites *Delta Queen Steamboat Co.*, 889 F.2d at 599, *Container Prods., Inc. v. United Steel-*

---

ployee shall refuse to obey an order." This provision is not at issue here.

**14.** As noted earlier, the Agreement has strict requirements regarding enforcement of company-made rules. *See supra* note 8.

*workers,* 873 F.2d 818 (5th Cir.1989), and *Local 814, Int'l Bhd. of Teamsters v. Sotheby's, Inc.,* 665 F.Supp. 1089 (S.D.N.Y. 1987). In these cases, the arbitrators modified employer-imposed penalties after comparing them with disciplinary treatment of other employees who had committed similar infractions. In each case, the arbitrator's award was vacated. *Delta Queen,* 889 F.2d at 604; *Container Products,* 873 F.2d at 820; *Sotheby's,* 665 F.Supp. at 1096.

Despite factual similarities to the situation here, the cited cases do not support Irving's position. In each case, the arbitrator found just cause for discharge, at least implicitly, and having made such a finding was prevented by the Agreement from disturbing the employer's choice of discipline. *See Delta Queen,* 889 F.2d at 601; *Container Products,* 873 F.2d at 819–20; *Sotheby's,* 665 F.Supp. at 1092.[15] Here, by contrast, Vernon made no finding of just cause—either implicit or explicit—and expressly reached the opposite conclusion. Moreover, there is no language in the Agreement "which expressly limits or removes from the arbitrator the authority to review the remedy in this case." *Eberhard Foods, Inc. v. Handy,* 868 F.2d 890, 892 (6th Cir.1989).

■ Just as important, however, is the fact that Vernon's decision—despite briefly mentioning other employees—appears to have been based primarily on Irving's failure to adhere to progressive discipline. Vernon stated that "the Company has benignly condoned, if not blatantly tolerated, carelessness *on the part of the Grievant,* as well as other employees, in the past." Award at 15 (emphasis added). This statement, combined with the finding that Irving did "absolutely nothing" to warn Morris that "negligent handling of his truck would result in discharge," strongly supports a conclusion that Vernon found Irving to be in violation of the Agreement's recognition of progressive discipline. *Id.*

The treatment of other employees, in Vernon's own words, simply "reinforced [the company's] tolerant attitude" toward negligence. As such, their cases may have supplied some minor "guidance" to Vernon, *see Enterprise Wheel & Car,* 363 U.S. at 597, 80 S.Ct. at 1361, but do not appear to have played any more significant role in his decision. *See* Award at 16. It is true that Vernon could not disregard the Agreement and base an award on his "own personal notions of right and wrong." *DuPont,* 790 F.2d at 614. Vernon did not do this, however; he simply interpreted that part of the Agreement dealing with progressive discipline, and this was well within his authority.

### (3) Violation of Public Policy

Even if an arbitrator acts within his authority in deciding a labor contract dispute, his award will not be enforced if it violates public policy. *Misco,* 484 U.S. at 42–43, 108 S.Ct. at 373; *W.R. Grace & Co.,* 461 U.S. at 766, 103 S.Ct. at 2183; *Sheet Metal Workers,* 877 F.2d at 551. The public policy allegedly violated, however, "must be well defined and dominant, and is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *W.R. Grace & Co.,* 461 U.S. at 766, 103 S.Ct. at 2183 (quoting *Muschany v. United States,* 324 U.S. 49, 66, 65 S.Ct. 442, 451, 89 L.Ed. 744 (1945)). If the supposed public policy is not properly established, the arbitration award will not be set aside, no matter how "firmly rooted in common sense" a decision to vacate might be. *Misco,* 484 U.S. at 44, 108 S.Ct. at 374.

Irving alleges that Vernon's award violates "the public's interest in having safe drivers on the road who do not repeatedly violate traffic rules and regulations," which is a "public policy ... embodied in the case law, statutory law, and pure common sense." In support, Irving cites numerous federal and state laws that Mor-

---

**15.** In *Container Products,* the finding of just cause was not perfectly clear, but the Fifth Circuit held that the arbitrator, by stating that "evidence of cause for discharge ... has been presented by the Company," had "implicitly found the existence of just cause for dismissal." *Container Products,* 873 F.2d at 819–20.

ris's driving has supposedly violated.[16] Irving also points out that Morris "was involved in three serious accidents in the two years preceding his discharge," and that his driving record is less than stellar. According to Irving, the combination of these factors "inescapably lead[s] to the conclusion that the arbitrator's order to reinstate [Morris] is clearly in contravention of public policy." *See* Plaintiff's Supporting Memorandum at 19–21; Plaintiff's Reply/Response at 17–20.

To be successful, Irving's arguments must meet the standards set out in *Misco*. In that case, a company employee was "apprehended by police in the back seat of his car with marijuana smoke in the air and a lighted marijuana cigarette in the frontseat ashtray." *Misco*, 484 U.S. at 33, 108 S.Ct. at 368. The company, which had a rule against drug use on company property, discharged the employee. The arbitrator, finding that the company failed to prove that the employee actually had used the marijuana, reinstated him. *Id.* at 34, 108 S.Ct. at 368. The district court and the Fifth Circuit Court of Appeals both held that the arbitrator's award must be set aside, because it violated a public policy "against the operation of dangerous machinery by persons under the influence of drugs or alcohol." *Id.* at 35, 108 S.Ct. at 369.

The Supreme Court reversed, holding first that the courts below had failed to "establish a 'well-defined and dominant' policy against the operation of dangerous machinery while under the influence of drugs." *Id.* at 44, 108 S.Ct. at 374. The Court stated that "[a]lthough such a judgment is firmly rooted in common sense," it was founded on "a formulation of public policy based only on 'general considera-

tions of supposed public interests'" and was "not the sort that permits a court to set aside an arbitration award that was entered in accordance with a valid collective-bargaining agreement." *Id.* The Court then held that even if the supposed public policy had been sufficiently well-defined, the connection between discharge of the employee and promotion of the policy was "tenuous at best," and provided an insufficient basis for vacating the arbitrator's award. As the Court stated, "refusal to enforce an award must rest on more than speculation or assumption." *Id.*

■ In light of *Misco*, Irving's claim fails. Initially, the Court is not convinced that the cited group of individual laws, although clearly related to traffic regulation, necessarily embody the policy advanced by Irving. *See Nupulse, Inc. v. Schlueter Co.*, 853 F.2d 545, 548–49 (7th Cir.1988) (discussing the standards for determining the meaning and purpose of statutes).[17] Ultimately, however, this issue is not critical, because even if such a policy exists, Irving has failed to show how Vernon's reinstatement of Morris would violate it. Irving has cited no law that prohibits the employment, reemployment, or reinstatement of an employee who has been involved in an accident, whether ticketed or not, and the Court knows of no such prohibition. Vernon's award therefore does not violate any established law or legal precedent. *See id.* at 44.[18] Irving also has failed to show that Morris is not a "safe driver." Vernon—the fact-finder chosen by the parties—examined all the evidence about Morris's driving, including his accident record, yet decided to reinstate him. The Court will not second-guess this decision.[19]

---

16. Among the laws Irving cites is Indiana's codification of the Uniform Act Regulating Traffic on Highways, Ind.Code §§ 9–4–1–1 to 9–4–1–136. This entire section, however, has been repealed. *See* Ind.Code Ann. § 9–4–1–1 (West Supp.1991).

17. Indeed, the stated purpose of the repealed Uniform Act Regulating Traffic on Highways, rather than "having safe drivers on the road who do not repeatedly violate traffic rules," was "to make uniform the law of those states which

enact it." Ind.Code § 9–4–1–136 (1979) (now repealed).

18. This Court does not reach the issue of whether public policy is violated only if a positive law is broken. *See DuPont*, 790 F.2d at 616; *id.* at 617–20 (Easterbrook, J., concurring).

19. Any examination of Vernon's conclusions about Morris as a driver would be improper, because this would approach the kind of review on the merits that this Court is forbidden to

## III. CONCLUSION

In sum, the Court concludes that Vernon's decision to reinstate Morris conditionally was properly rendered, because it did not contravene the parties' collective bargaining agreement and did not violate any well-defined public policy. Accordingly, the Court DENIES Irving's motion for summary judgment, GRANTS the defendants/counterclaimants' motion for summary judgment, and ORDERS that the arbitration award be ENFORCED.

SO ORDERED.

---

conduct. *See Chicago Typographical,* 935 F.2d at 1504–05. Moreover, the Court notes as a practical matter that it is unlikely Vernon would have reinstated Morris to a truck-driving position—even conditionally—if he had believed him to be unsafe.