**JACKSONVILLE AREA ASSOCIATION FOR RETARDED CITIZENS, Plaintiff,**

v.

**GENERAL SERVICE EMPLOYEES UNION, LOCAL 73, Defendant.**

No. 94–3315.

United States District Court, C.D. Illinois, Springfield Division.

May 26, 1995.

Larry D. Kuster, Jacksonville, IL, for plaintiff.

Eric E. Mennel, Chicago, IL, for defendant.

### OPINION

RICHARD MILLS, District Judge:

This matter was submitted to an arbitrator pursuant to a collective bargaining agreement.

Plaintiff, the Jacksonville Area Association For Retarded Citizens ("JAARC"), asks the Court to vacate the arbitrator's decision. Defendant, the General Service Employees Union, Local 73 ("Union"), counters seeking an affirmance and the enforcement of the arbitrator's decision.

In part I of this opinion and order we conclude that the arbitrator did not exceed his authority by reinstating the employees.

In part II, we conclude that the reinstatement does not violate public policy.

Accordingly, the JAARC's motion for summary judgment is denied and the Union's motion for summary judgment is allowed.

### BACKGROUND

The JAARC is a not-for-profit corporation providing services to physically and mentally impaired individuals. On the morning of April 7, 1994, four of the JAARC's employees (collectively referred to as "employees") left their regular place of work at building #1, to visit building #2 where they intended to determine if a particular client was a hermaphrodite.

Upon arrival at building #2, the employees located the client in a classroom. Following a discussion with co-workers, the employees removed the client from the classroom and escorted the client to the restroom to be toileted. At the restroom, one employee positioned himself at the door while another lowered the client's pants in the presence of the other two employees. After satisfying their curiosity, the employees returned the client to the classroom.

Eventually, co-workers ascertained the employees' motivation for toileting the client. The event was ultimately reported to management. Once management became aware of the incident, an investigation ensued and the employees were subsequently discharged on April 15, 1994.

The employees were members of the Union, and the Union and the JAARC were parties to a collective bargaining agreement ("Agreement"). On April 18, 1994, the Union submitted written grievances on behalf of the employees, demanding that they be restored to their former positions. Unable to resolve the dispute, pursuant to the Agreement, the Union appealed the grievances to arbitration on May 3, 1994.[1]

The arbitration hearing was conducted in the first week of November 1994. The issue before the arbitrator was whether the employees were "discharged for just cause, and,

1. Article VIII of the Agreement establishes the grievance procedures. In the event the parties are unable to resolve their dispute, once the provisions of Article VIII are complied with, the dispute may be appealed to arbitration pursuant to the provisions of Article IX.

if not, what should the remedy be?" On November 7, 1994, the arbitrator issued his written opinion concluding that the employees' behavior was obviously improper. However, he also determined that discharge was too severe of a penalty, an unpaid suspension being more appropriate under the circumstances, and reinstated the employees to their former positions but without back-pay.

On November 29, 1994, the JAARC filed the instant complaint in federal court seeking to vacate the arbitrator's decision.

### DISCUSSION/ANALYSIS

The JAARC challenges the arbitrator's decision on two grounds. *First,* it contends that the arbitrator exceeded his authority, *i.e.,* that his decision is not supported by the language of the Agreement. *Second,* the JAARC argues that the decision is contrary to public policy. These arguments will be addressed in turn.

### I

■■■ It is well established that courts play an extremely limited role when asked to review an arbitrator's decision. *See United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 36, 108 S.Ct. 364, 369–70, 98 L.Ed.2d 286 (1987). Indeed, courts must give arbitrators' decisions considerable deference; "only if the arbitrator's decision fails to draw its essence from the collective bargaining agreement will a court refuse to enforce that decision." *Carpenter Local 1027 v. Lee Lumber & Bldg. Material,* 2 F.3d 796, 797 (7th Cir. 1993) (citations omitted). "An arbitration award 'draws its essence' from the contract so long as that award is based on the arbitrator's interpretation of the contract." *Id.* In fact, as long as the decision is based on the interpretation of the contract, "[t]he court is forbidden to substitute its own interpretation even if convinced that the arbitrator's interpretation was not only wrong, but plainly wrong." *Chicago Typographical Union v. Chicago Sun–Times,* 935 F.2d 1501, 1505 (7th Cir.1991); *accord, Carpenter Local 1027,* 2 F.3d at 797 (As long as the award draws its essence from the contract, the court is pro-

hibited from disturbing that award, "even if the court is convinced that the interpretation is unsound or based on a factual or legal error."). Accordingly, an arbitrator's decision fails to draw its essence from the collective bargaining agreement and will thus be vacated only when it is based on "some body of thought, or feeling, or policy, or law that is outside the contract." *Carpenter Local 1027,* 2 F.3d at 797; *see Chicago Typographical Union,* 935 F.2d at 1505 ("An award based on the arbitrator's personal or policy views rather than on the contract is unenforceable."). Moreover, any reasonable doubt as to whether the arbitrator interpreted the contract or relied on some private notion of equity should be resolved in favor of enforcing the decision. *Ethyl Corp. v. United Steelworkers of America,* 768 F.2d 180, 185 (7th Cir.1985).

As previously indicated, the JAARC contends that the arbitrator abused his authority by fashioning a decision based on his own brand of industrial justice, a decision contrary to the express language of the Agreement. Specifically, the JAARC argues that the Agreement permits the discharge of employees who mentally abuse clients. Further, since the arbitrator explicitly or, at the very least, implicitly concluded that the employees mentally abused the client at issue, his inquiry ceased and he should not have determined whether the JAARC's disciplinary action (discharge) was too severe. In response, the Union argues that the Agreement explicitly allows for the imposition of a particular form of disciplinary action only upon a showing of "just cause." And, since the Agreement does not define "just cause," the arbitrator must decide whether the improper conduct constituted "just cause" for the chosen disciplinary action. Thus, argues the Union, because there was no express language to guide the arbitrator's decision, he certainly based the "just cause" determination on his interpretation of the Agreement. We agree.

■■■ It is undisputed that the employees' conduct was improper and constituted mental abuse of a client.[2] However, neither the

---

2. Section 4.4.15.2 of the Personnel and Opera-       tional Policies Handbook defines mental abuse as

Agreement nor the Personnel and Operational Policies Handbook ("Handbook") provide for the mandatory discharge of an employee who mentally abuses a client. Indeed, § 4.4.15 of the Handbook provides in pertinent part that "mental abuse of clients ... is expressly forbidden and *can* result in immediate suspension or dismissal." (emphasis added). Thus, as evidenced by § 4.4.15, any suggestion that Plaintiff was compelled to discharge the employees as a result of their improper conduct is misplaced.

Next, in an effort to determine the proper course of action, the arbitrator highlighted several relevant contractual provisions. Among these provisions is Article VII, § 7.1. This section provides that: "the Employer agrees with the tenets of corrective and progressive discipline. Disciplinary action imposed against the Employee shall include the following: (a) Oral warning; (b) Written warning; (c) Suspension without pay; and (d) Discharge." Section 7.1 further provides that "the employer *may* impose discipline commensurate with the severity of the offense." (emphasis added). Additionally, § 7.2 provides that "disciplinary action shall only be imposed for just cause."

However, the Agreement and the Handbook neglect to define "just cause." In a recent case, the Seventh Circuit encountered a similar situation. In that case, the employment contract at issue also failed to define just cause. The Court noted that the arbitrator began his decision by stating that "where an employment contract provides that an employee may be disciplined or discharged for just cause, the degree of discipline imposed must reasonably relate to the seriousness of the employee's proven offense and the employment record of the employ-

ee." *Chrysler Motors Corp. v. Int'l Union,* 959 F.2d 685, 688 (7th Cir.1992); *see E.I. DuPont de Nemours v. Grasselli Employees Ass'n,* 790 F.2d 611, 619 (7th Cir.1986) (Easterbrook, J., concurring) (Most collective bargaining agreements "provide ... that employees may be discharged for 'just cause.' *The arbitrator must define just cause.*") (emphasis ours). In the instant case, although the arbitrator did not explicitly frame his decision in this fashion, he indisputably employed this "rule" in the course of analyzing the dispute at issue. Indeed, the arbitrator first noted that the employees' conduct was improper. Next, he discussed whether discharge was too severe considering the employees' overall work records and the economic and social stigma associated with such a discharge. Finally, in his opinion, just cause was not present to justify the employees' discharge.

In arguing that the arbitrator's decision was based on something other than the essence of the contract, the JAARC is apparently troubled by the arbitrator's frequent reference to his own personal beliefs or feelings.[3] However, "[i]n the absence of any explicit provision, the arbitrator is free to bring his informed judgment to bear in order to reach a fair solution to the problem. *This is especially true when it comes to formulating remedies.*" *Chrysler Motors Corp.,* 959 F.2d at 688 (emphasis ours) (*citing, Misco,* 484 U.S. at 41, 108 S.Ct. at 372). This is exactly what occurred in the instant case. The arbitrator's statements merely reflect his belief that the employees' conduct was not serious enough to justify discharge in light of the circumstances, *i.e.,* their discharge was not based on just cause. Instead, the arbitrator decided that suspending

"any demeaning, dehumanizing behavior which occurs with a frequency or severity to threaten the emotional well-being of the client" and the "creation of the threat of physical abuse." Section 4.4.15.4 further provides that "creating a risk of any of the above or willfully allowing the above to occur shall be treated as direct physical or mental abuse and shall be subject to the same disciplinary policies."

3. For example, the arbitrator stated: (1) "If employees would ask themselves, 'Would I want myself or someone dear to me to be treated like this?' these problems would not arise. And it is

my experience that if one simply applies this golden rule, patient abuse would be avoided;" (2) "when considering what discipline is appropriate the Arbitrator asked himself what he would feel if something like this happened to someone he cared for and the answer was obvious. He would be very, very angry;" and (3) "the Arbitrator also asked himself whether he would want these Employees to lose their jobs and to be labeled as someone who abuses the weak and the answer is just as clear. No, this is not what he would want."

the employees without pay was sufficient. A decision the arbitrator was both qualified and—more importantly—contracted by the parties to make.[4]

■ Thus, although the JAARC disagrees with the arbitrator's decision reinstating the employees, it appears clear that his decision flows from the essence of the contract. *See Chrysler Motors Corp.*, 959 F.2d at 688 ("[W]here it is contemplated that the arbitrator will determine remedies for contract violations that he finds, courts have no authority to disagree with his honest judgment in that respect.").

## II

Next, the JAARC attacks the arbitrator's decision by arguing that the reinstatement of the previously discharged employees violates public policy. The Union counters, arguing that public policy concerns do not mandate the termination of an employee involved in improper conduct and since the arbitrator concluded that a reoccurrence was unlikely, no public policy is furthered by refusing to reinstate the employees to their former positions. After a thorough consideration of this issue, we agree with the Union's analysis.[5]

■ An exception to the well-settled rule that courts must defer to the judgment of an arbitrator "is the now-settled rule that a court need not, in fact cannot, enforce an award which violates public policy." *Stead Motors v. Automotive Machinists Lodge 1173*, 886 F.2d 1200, 1209 (9th Cir.1989) (en banc), *cert. denied*, 495 U.S. 946, 110 S.Ct. 2205, 109 L.Ed.2d 531 (1990); *accord, E.I. DuPont de Nemours*, 790 F.2d at 615. However, the public policy allegedly violated "must be well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *W.R. Grace & Co. v. Local Union 759, Int'l Union of Rubber Workers*, 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983). Moreover, "the question of public policy is wholly independent from the collective bargaining agreement and is ultimately one for the courts." *Chrysler Motors Corp.*, 959 F.2d at 687. (citations omitted).

■ The leading and dominant case setting out the rules applicable to reviewing arbitration awards on public policy grounds is *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). As emphasized in *Misco*, before setting aside an arbitration award on public policy grounds, a court must first identify with specificity the existing laws and legal precedents underlying its decision.[6] *Id.* at 43–44, 108 S.Ct. at 373–74. This requirement is necessary to ensure that such a public policy actually exists, preventing courts from utilizing imprecise, general notions of "supposed public interests." *Id.*

In the instant matter, there does not appear to be a dispute concerning the existence of a public policy supporting the prohibition and prevention of the abuse of mentally impaired individuals. Indeed, there are several statutes that support this conclusion. For instance, pursuant to § 2–112 of the Illinois Mental Health and Developmental Disabilities Code, "Every recipient of services in a mental health or developmental disability facility shall be free from abuse and neglect."

---

4. The "parties may limit an arbitrator's authority by expressly removing the just cause determination from his scope of authority [citation omitted] or by enumerating the specific items that will constitute just cause." *Irving Materials, Inc. v. Coal, Ice, Building Material & Supply Drivers, Heavy Haulers, Warehousemen and Helpers, Local 716*, 779 F.Supp. 968, 975 n. 12 (S.D.Ind.1992). Here, there were no such limits placed on the arbitrator's authority. Thus, the just cause determination was indisputably within his discretion and control.

5. The instant order and opinion is not the first time we considered this issue in this matter. In our order of April 12, 1995, we highlighted and directed the parties to comment on several issues that were not briefed in their respective memoranda.

6. The Supreme Court initially stated this requirement in *W.R. Grace & Co.*, 461 U.S. 757, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983). As reemphasized in *Misco*, "At the very least, an alleged public policy must be properly framed under the approach set out in *W.R. Grace . . . .*" *Misco*, 484 U.S. at 43–44, 108 S.Ct. at 373–74.

405 ILCS 5/2–112.[7] Further, § 3–210 provides that:

> When an investigation of a report of suspected abuse of a recipient of services indicates, based upon credible evidence, that an employee of a mental health or developmental disability facility is the perpetrator of the abuse, that employee shall immediately be barred from any further contact with recipients of services of the facility, pending the outcome of any further investigation, prosecution, or disciplinary action against the employee.

405 ILCS 5/3–210.

Additionally, the Protection and Advocacy for Mentally Ill Persons Act authorizes the Governor of the state of Illinois to "designate an agency to administer the protection and advocacy system for mentally ill persons." 405 ILCS 45/1. Pursuant to this Act, the designated agency has the power to, among other things, investigate incidents of abuse of mentally ill persons. 405 ILCS 45/3(A)(1).[8]

Finally, by enacting the Protection and Advocacy for Mentally Ill Individuals Act of 1986, 42 U.S.C. § 10801, *et seq.*, the federal government also statutorily recognized society's interest in protecting mentally impaired individuals from abuse. Acknowledging, among other things, that "individuals with mental illness are vulnerable to abuse and serious injury," § 10801(a)(1), Congress enacted this Act with many notable purposes in mind, including; "to ensure that the rights of individuals with mental illness are protected," § 10801(b)(1), and to assist the States in establishing and operating a protection and advocacy system designed to "protect and advocate the rights of such individuals" and to "investigate incidents of abuse and neglect of individuals with mental impairments," § 10801(b)(2).

Thus, as evidenced by the preceding discussion, one cannot persuasively argue against the existence of a strong public policy prohibiting the abuse of mentally impaired individuals.

■ Once the public policy is properly framed, in order to vacate the arbitrator's award, *Misco* demands the showing of a clear violation of that policy. In the instant matter, this requirement also does not appear to be in dispute. Although the arbitrator arguably does not explicitly state that the client was mentally abused, it appears clear from his decision that such a conclusion can be reasonably inferred. In his decision, the arbitrator states, in pertinent part:

> The evidence is clear that the Grievants set out to view the client's genitalia and used the excuse of toileting the client to satisfy their prurient interest. That is clearly wrong. The Grievants, with only a moment's reflection, should have known what they were doing was wrong. * * * And it is my experience that if one simply applies this golden rule, patient *abuse* would be avoided. * * * The fact that there seems to have been minimal effect on the client in this instance does not seriously alter my conclusion that this was improper treatment of a client. For one thing, one cannot know for certain that the client suffered no ill effects. (emphasis added).

Thus, the second requirement of *Misco* is also satisfied.

However, now the problems start. The preceding discussion is premised on the conclusion that one can establish a public policy violation by referring to past conduct, *i.e.*, the conduct that sustained the initial discharge of the employees at issue. But, as the Union argues, the issue (at least in the Ninth Circuit) is not whether the employees' past conduct violated public policy, rather, the issue is whether the *reinstatement* of those employees to their former positions violates public policy. *See Stead Motors*, 886 F.2d at 1212. Further, since the arbitrator concluded, at least implicitly, that the em-

---

7. Abuse is defined as "any physical injury, sexual abuse, or mental injury inflicted on a recipient of services other than by accidental means." 405 ILCS 5/1–101.1

8. Abuse is defined under this Act as "any act or failure to act by an employee of a facility rendering care or treatment, which act or failure was performed knowingly, recklessly or with intentional disregard for the rights of a mentally ill person...." 405 ILCS 45/2(2).

ployees were unlikely to commit a similar violation in the future,[9] and the JAARC cannot identify any statute or regulation that prohibits the *reinstatement* of the employees under the circumstances, their reinstatement cannot violate public policy. Thus, according to the Union, the arbitrator's decision must stand. *See Stead Motors,* 886 F.2d at 1213 ("[A] court would be hard-pressed to find a public policy barring reinstatement in a case in which an arbitrator, has expressly or by implication, determined that the employee is subject to rehabilitation and therefore not likely to commit an act which violates the public policy in the future.").

Although, the Fifth Circuit recently rejected the Ninth Circuit's reasoning, *see Gulf Coast Indus. Workers Union v. Exxon Co.,* 991 F.2d 244, 253–54 (5th Cir.1993), we are inclined to agree with our sister courts applying the rationale of *Stead Motors* and thereby determining whether the *reinstatement* of the discharged employee, not his past conduct, violates public policy. *See BPS Guard Services, Inc. v. International Union,* 735 F.Supp. 892, 895 (N.D.Ill.1990) (Plaintiff "must demonstrate that the *reinstatement* of [the employee] would violate public policy. It is insufficient to argue, as does [plaintiff], that [the employee's] *past conduct* violated public policy.") (emphasis in original); *Irving Materials, Inc. v. Local 716,* 779 F.Supp. 968, 978 (S.D.Ind.1992) (Plaintiff "has failed to show how [the arbitrator's] *reinstatement* of defendant would violate" public policy.) (emphasis ours).

More importantly, it appears the Seventh Circuit is leaning in this direction. In *E.I. DuPont de Nemours,* the Seventh Circuit, after assuming that workplace safety was a valid public policy, accepted the arbitrator's determination that the discharged employee was unlikely to engage in improper conduct in the future and concluded that his reinstatement did not violate public policy. *E.I. DuPont de Nemours,* 790 F.2d at 617. In *Chrysler Motors Corp.,* a decision several years later, the Seventh Circuit favorably cited the Ninth Circuit's *Stead Motors* decision and also cited the *E.I. DuPont de Nemours* decision, noting parenthetically that the *E.I. DuPont de Nemours* Court "refus[ed] to second-guess [the] arbitrator's reinstatement order given [the] employer's failure to show that *reinstatement* would, in itself, violate public policy." *Chrysler Motors Corp.,* 959 F.2d at 688–89. (emphasis ours). As a result of these opinions, especially the more recent *Chrysler Motors Corp.* decision, we believe the Seventh Circuit will adopt an approach similar to that of the Ninth Circuit.

With that in mind, in order to resolve the instant dispute, we must now determine whether the arbitrator's award *reinstating* the employees to their former positions, after first implicitly concluding that they were amenable to discipline, violates a well established public policy.[10] The JAARC cannot cite any law that prohibits employment, reemployment, or reinstatement of an employee under the circumstances of the instant case, nor is the Court aware of any such prohibition.[11] Accordingly, we hold that

---

9. Both parties assume that the arbitrator implicitly concluded that the employees were amenable to discipline. Although the arbitrator did not explicitly state that, he did state that he "sincerely believes the [employees] have learned their lesson" and that the employees were "genuinely caring people who simply made a stupid mistake...." Since their assumption appears to be accurate and the parties are not disputing this issue, we will proceed as if it were indeed a valid assumption.

10. In *Misco,* the Supreme Court explicitly declined to address the issue of whether "a court may refuse to enforce an award on public policy grounds only when the award itself violates a statute, regulation, or other manifestation of positive law, or compels conduct by the employer that would violate such a law." *Misco,* 484 U.S. at 45 n. 12, 108 S.Ct. at 374 n. 12.

11. The closest statute cited by the JAARC is 405 ILCS 5/3–210. This statute provides "When an investigation of a report of suspected abuse of a recipient of services indicates, based upon credible evidence, that an employee of a mental health or developmental facility is the perpetrator of the abuse, that employee shall immediately be barred from any further contact with recipients of services of the facility, *pending the outcome of any further investigation, prosecution or disciplinary action against the employee.*" (emphasis ours).

However, by its very terms, this statute does *not* bar the employment or reinstatement of a disciplined employee. Rather, it bars contact with recipients of mental health services after credible evidence indicates that an employee abused such recipients, *pending the outcome of further disciplinary action.* Here, this statute was complied with. The employees were sus-

the arbitrator's award reinstating the employees to their former positions, after implicitly concluding that they were amenable to discipline, does not violate public policy.

## III

In conclusion, the Court states that it is deeply disturbed and utterly revolted by the employees' conduct underlying this action. We can confidently state that if we were arbitrating the instant dispute, the employees would not have been reinstated to their former positions.

However, that is not the issue here. The parties contractually agreed to have an arbitrator interpret the disciplinary provisions of their employment agreement and now the JAARC must live with that decision. The JAARC could have contracted for the mandatory discharge of an employee who engages in mental or physical abuse of a client, they could have contracted for the removal of the "just cause" determination from the arbitrator's control, they could have defined "just cause" in their contract, or they could have contracted for a review of his decision. But the JAARC did not do this. If the JAARC is not pleased with the outcome here, they should keep this decision in mind when the time comes to renew their current employment agreement.

Additionally, since the *reinstatement* of the employees does not violate any statute, regulation, or other form of law, based on recent decisions from both the district and appellate courts within this circuit, we cannot conclude that public policy concerns mandate the reversal of the arbitrator's decision. Thus, we reluctantly affirm his decision.

*Ergo,* the JAARC's motion for summary judgment is DENIED. The Union's motion for summary judgment is ALLOWED. The employees are entitled to compensation for the period in which the JAARC failed to effectuate the arbitrator's award.[12]

---

pended following a credible report of patient abuse. After an *investigation* and the proper *disciplinary* procedures were satisfied, an arbitrator reinstated them to their former positions. This statute appears to be a procedural safeguard against multiple abuse by a suspect employee. It says nothing explicitly or implicitly about mandatory termination of that employee.

12. The JAARC does not dispute that the employees are entitled to this compensation.