**CHICAGO TYPOGRAPHICAL UNION No. 16, Plaintiff–Appellant,**

v.

**CHICAGO SUN–TIMES, INCORPORATED, Defendant–Appellee.**

Nos. 90–3501, 90–3503.

United States Court of Appeals,
Seventh Circuit.

Argued May 13, 1991.

Decided June 25, 1991.

Gilbert A. Cornfield, Gail E. Mrozowski, Cornfield & Feldman, Chicago, Ill., for Chicago Typographical Union No. 16.

Jonathan Vegosen, Damon E. Dunn, Ellen B. Epstein, Levin & Funkhouser, Chicago, Ill., Thomas M. Seger, David G. Holcombe, Elliot S. Azoff, Lawrence Pollack, Baker & Hostetler, Cleveland, Ohio, for Chicago Sun–Times, Inc.

Before POSNER, FLAUM and EASTERBROOK, Circuit Judges.

POSNER, Circuit Judge.

We have consolidated for decision these two appeals because though they arise from separate cases before different district judges, the parties and counsel are the same, both appeals involve arbitration issues, and both cases derive ultimately from the same arbitration award.

Chicago Typographical Union No. 16, the plaintiff and appellant in both cases, represents the composing-room employees of both the Chicago Sun–Times, Inc.—the publisher of Chicago's second-largest newspaper, and the defendant and appellee in these cases—and the publisher of Chicago's largest newspaper, the *Chicago Tribune*. We shall call the respective publishers the Sun–Times and the Tribune. The union and the Sun–Times had long operated under a succession of term collective bargaining agreements. In 1975 they added a "Supplemental Agreement" that conferred certain rights on the workers and that by its terms was to be a part of all future collective bargaining agreements between the parties and could be amended only by mutual agreement.

The most recent term agreement—what we shall call the "Main Agreement"—expired in 1989, but the parties agreed to keep it in force, subject to cancellation upon 48 hours' notice by either party. Section 7(a) of the Main Agreement is a "most favored nations" clause: it entitles the Sun–Times to any concessions that the union grants the Tribune. Section 7(b), however, states that "it is understood that the provisions of the Supplemental Agreement of 1975 are neither superseded, affected, or supplanted by the language of" section 7(a). The Main Agreement contains an arbitration clause; the Supplemental Agreement does not.

In 1989 the union signed a collective bargaining agreement with the Tribune that, in the Sun–Times' view, made significant concessions to the Tribune. In July of that year, in reliance on the most favored nations clause in the Main Agreement and over the opposition of the union, the Sun–Times changed some of the terms and conditions of employment in its composing room. The union filed a grievance, which was submitted to arbitrator Fred Witney, who in a written opinion issued later in 1989 found that some of the changes were authorized by the most favored nations clause and others were not. To the objection that even the former changes were forbidden because they violated the Supplemental Agreement and hence (the union argued) were excluded from the most favored nations clause by section 7(b), Witney in his opinion responded in a single sentence: "Nor is there need to determine the application of Section 7(b) to the circumstances of this case."

On January 10, 1990, the union filed suit in federal district court challenging Witney's award insofar as it permitted the Sun–Times to make changes that infringed rights conferred by the Supplemental Agreement. The basis of federal jurisdiction was section 301 of the Taft–Hartley Act, 29 U.S.C. § 185, which creates federal jurisdiction over suits to enforce labor contracts. There is no doubt of the applicability of section 301. A suit to throw out a labor arbitrator's award is, in the usual case anyway—including this case—a suit to enforce the labor contract that contained the clause authorizing the arbitration of disputes arising out of the contract. For in arguing against the award, the plaintiff normally will be pointing to implicit or explicit limits that the contract places on the arbitrator's authority—principally that he was to interpret the contract and not go off on a frolic of his own—and arguing that the arbitrator exceeded those limits. *Kallen v. District 1199*, 574 F.2d 723, 725 (2d Cir.1978); *Harry Hoffman Printing, Inc. v. Graphic Communications, International Union*, 912 F.2d 608, 612 (2d Cir. 1990).

If the plaintiff were challenging the award on grounds neither explicitly nor implicitly contractual, it might seem problematic to base federal jurisdiction on a statute (section 301) that authorizes only "suits for violations of [labor] contracts." We are sympathetic to the view of the Second Circuit in *Kallen*, however, that the statute can and should be stretched a bit to em-

brace *all* suits arising out of awards by arbitrators appointed under labor contracts, whether it is a suit to enforce or to set aside the award, and if the latter whether the suit is based on contractual or noncontractual grounds. 574 F.2d at 725; cf. *International Brotherhood of Electrical Workers v. Sign–Craft, Inc.*, 864 F.2d 499, 502 (7th Cir.1988). It would not only be odd, it would be pointless, to make federal jurisdiction depend on whether the winner was seeking to enforce the arbitration award or the loser to challenge it, since the loser could by disregarding the award force the winner to sue, and by this oblique means gain access to the federal court (if necessary removing the case to that court). In any event, since the suit here was based on contractual grounds, it was a suit to enforce a labor contract and the district court therefore unquestionably had jurisdiction. The court upheld Witney's award. The union's appeal from that decision is No. 90–3503.

■ Throughout this period the parties were negotiating over possible terms of a new collective bargaining agreement to replace the expired Main Agreement. Two weeks after the union filed the suit challenging Witney's award, the Sun–Times declared a bargaining impasse and made what it described as a "final offer" of a new agreement. The offer incorporated, among other proposals, the changes that Witney had said the most favored nations clause of the Main Agreement authorized the company to make unilaterally. The union responded not only by rejecting the "final offer" but also by demanding arbitration on the ground that the offer created a "disagreement as to interpretation or enforcement of the terms of this Agreement [the Main Agreement]," the operative language of the Main Agreement's arbitration clause. The company refused to arbitrate but also did not implement its "final offer," as it was entitled to do if the parties really were at an impasse. *Richmond Recording Corp. v. NLRB*, 836 F.2d 289, 293 (7th Cir.1987); *Local Union No. 47 v. NLRB*, 927 F.2d 635, 642 (D.C.Cir.1991). Instead, bargaining continued. In April the union sued the Sun–Times, seeking an order to compel arbitration. This suit, claiming as it did that the Sun–Times had violated the arbitration clause of the Main Agreement by refusing to submit to arbitration, and seeking an order compelling it to submit, was based squarely on section 301. So we need not decide the applicability to labor disputes of the federal arbitration code (Title 9), which authorizes federal judicial assistance—including the issuance of an order to compel arbitration, 9 U.S.C. § 4—for the arbitration of certain disputes that if litigated would fall within federal jurisdiction. *Harry Hoffman Printing, Inc. v. Graphic Communications, International Union, supra,* 912 F.2d at 611. The question of the applicability of Title 9 to labor contracts is unsettled, *Gilmer v. Interstate/Johnson Lane Corp.*, —— U.S. ——, 111 S.Ct. 1647, 1659–60, 114 L.Ed.2d 26 (1991) (dissenting opinion), and also unimportant as a practical matter since the Supreme Court has told us that we can look to that title in formulating rules for suits under section 301 arising from the alleged breach of an arbitration clause. *United Paperworkers v. Misco*, 484 U.S. 29, 40 n. 9, 108 S.Ct. 364, 372 n. 9, 98 L.Ed.2d 286 (1987).

The district court held that the Sun–Times' unimplemented final offer had not created a disagreement within the meaning of the clause, because the dispute between the parties had not yet ripened into an arbitrable controversy. The court therefore refused to order arbitration. The union's appeal from this ruling is No. 90–3501. We learned at argument that in February of this year, following some further negotiating sessions, the company laid another "final offer" on the table, much like the previous one, and again did not move to implement it when the union rejected the offer. No further negotiations to replace the expired, although still operative, Main Agreement have taken place since the company made its last "final offer," but they could resume at any time.

■ The appeal from the decision upholding the arbitration award is the easier, so let us take it first. Federal courts do not review the soundness of arbitration

awards. An agreement to submit a dispute over the interpretation of a labor or other contract to arbitration is a contractual commitment to abide by the arbitrator's interpretation. If the parties want, they can contract for an appellate arbitration panel to review the arbitrator's award. But they cannot contract for *judicial* review of that award; federal jurisdiction cannot be created by contract. Unless the award was procured by fraud, or the arbitrator had a serious conflict of interest—circumstances that invalidate the contractual commitment to abide by the arbitrator's result—his interpretation of the contract binds the court asked to enforce the award or to set it aside. The court is forbidden to substitute its own interpretation even if convinced that the arbitrator's interpretation was not only wrong, but plainly wrong. *United Paperworkers v. Misco, supra,* 484 U.S. at 37–38, 108 S.Ct. at 371–372; *Independent Employees' Union v. Hillshire Farm Co.,* 826 F.2d 530, 532–33 (7th Cir.1987); *Hill v. Norfolk & Western Ry.,* 814 F.2d 1192, 1194–95 (7th Cir.1987); *Ethyl Corp. v. United Steelworkers,* 768 F.2d 180, 184–85 (7th Cir.1985).

■ To be entitled to set aside the arbitrator's action, then, the court must find a violation of the agreement to arbitrate. Which means that the role of the court is severely limited—but not negligible. Since the arbitrator's function, ordinarily and in this case, is limited to interpreting the contract, the court asked either to set aside or to enforce his award must make sure that he abided by that limit on his authority, for otherwise the award was made in violation of the agreement to arbitrate. This is the meaning of the slogan from *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960), that the award must "draw its essence" from the contract that the arbitrator was asked to interpret. *United Paperworkers v. Misco, supra,* 484 U.S. at 38, 108 S.Ct. at 369; *Ethyl Corp. v. United Steelworkers, supra,* 768 F.2d at 184–85; *Chicago Newspaper Publishers' Ass'n v. Chicago Web Printing Pressmen's Union No. 7,* 821 F.2d 390 (7th Cir.1987). The arbitrator is not free to think or to say, "The contract says X, but my view of sound policy leads me to decree Y." An award based on the arbitrator's personal or policy views rather than on the contract is unenforceable. *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 53, 94 S.Ct. 1011, 1022, 39 L.Ed.2d 147 (1974). Of course the parties could if they wanted authorize the arbitrator to base his award on such views, just as they can authorize "interest" arbitration, which is noninterpretive (as we are about to see). But it is the rare arbitration clause that confers so free-wheeling a discretion; the arbitration clause in the Main Agreement between the union and the Sun–Times did not.

■ Nowhere in arbitrator Witney's long opinion, however, is there a hint that he had or was acting on his own view of the proper terms and conditions of employment in the Sun–Times' composing room. He was interpreting the contract. Maybe erroneously, for he failed to explain *why* he thought it unnecessary to consider the application of section 7(b), which on its face forbids using the most favored nations clause to take away rights granted the workers by the Supplemental Agreement. Yet an alternative interpretation of section 7(b) is possible, indeed plausible: that while section 7(a)—the most favored nations clause—does not *of its own force* cancel the Supplemental Agreement, it does authorize the Sun–Times to piggyback on any concession that the union grants the Tribune, and to the extent that this eats into rights granted by the Supplemental Agreement, those rights are gone. The union can protect them by refusing to grant the Tribune concessions inconsistent with the Supplemental Agreement. The ball is thus in the union's court.

The problem is that the arbitrator did not articulate this or any other interpretation of section 7 that would reconcile its two clauses, even though the union asked him, after he issued his opinion, to clarify precisely this point. (He declined.) As a result, the opinion is not a reasoned statement of the grounds for its result. But it is still an interpretation of the contract.

Witney did not say, "I shall ignore section 7(b) because it contravenes my notions of sound labor relations." He believed section 7(b) to be inapplicable, but there is nothing to suggest that he arrived at this belief other than by interpreting the Main Agreement.

There are cases where although the arbitrator does not *say* that his award is noncontractual (as the arbitrator in *Roadmaster Corp. v. Production & Maintenance Employees' Local 504*, 851 F.2d 886, 889 (7th Cir.1988), did), there is no possible interpretive route to the award, so a noncontractual basis can be inferred and the award set aside. *Young Radiator Co. v. International Union*, 734 F.2d 321, 324–25 (7th Cir.1984); *Miller Brewing Co. v. Brewery Workers Local Union*, 739 F.2d 1159, 1164 (7th Cir.1984); *George A. Hormel & Co. v. Local 9*, 879 F.2d 347, 351–52 (8th Cir.1989). The zanier the award, the less plausible it becomes to ascribe it to a mere error in interpretation rather than to a willful disregard of the contract. This approach can make the line between error and usurpation waver. But not in this case. For unlike *Hormel*, which is otherwise quite similar—but in which the dissenting judge may have had the better of the argument—the interpretive route here is clear. The arbitrator's failure to mark it is not a defect for which a court asked to set aside the award can provide a remedy.

■ It would be a serious practical mistake, moreover, to subject the reasoning in arbitrators' opinions to beady-eyed scrutiny. It might discourage them from writing opinions at all (a point made in *Enterprise Wheel & Car*, 363 U.S. at 598, 80 S.Ct. at 1361). Arbitrators are not required to write opinions, any more than juries are. It is a good thing when they do, because writing disciplines thought. We should not create disincentives to their doing so. The more basic point, however, is that since arbitrators' interpretations must be accepted even when erroneous, it cannot be correct that arbitrators are required to write *good* opinions.

In challenging the award, the union may (though it should not) have been misled by Justice Douglas's use of the phrase "draw its essence" in *Enterprise Wheel & Car* to describe the type of labor arbitration award that is beyond the judicial power to revise. *Ethyl Corp. v. United Steelworkers, supra*, 768 F.2d at 184. It is indeed difficult to understand, if words are taken at their face value, how an award can be said to "draw its essence" from the contract when as in this case (and *Hormel*) the arbitrator has failed to reconcile his award with apparently critical language in the contract. But by the same token it is difficult to understand how any misinterpretation of a contract could be said to "draw its essence" from that contract. All this just shows, however, that Justice Douglas's slogan is ambiguous, or misleading, or out of touch with today's judicial attitudes; for while it could be read as broadly as the union asks us to read it, it has not been.

■ The inadequacy of arbitrator Witney's explanation of his result is in any event not the real ground for the union's appeal, but merely a sally in the preliminary skirmishing. The real ground, it is apparent from the union's briefs and argument, is that the union thinks "draws its essence" means "reasonable." An award that is not a reasonable interpretation of the contract cannot in the union's view be said to draw its essence from the contract even if the arbitrator was sincerely though perhaps incompetently attempting to interpret the contract rather than to actualize his own notions of sound industrial management. This however is the position rejected in countless decisions (cardinally including the Supreme Court's decision in *Misco*) none of which the union has deigned to cite—even in its reply brief, though the Sun–Times had hammered away at them in its appellee's brief. A litigant can attempt to distinguish adverse cases; he can ask that they be overruled; but he cannot ignore them. The ostrich's posture is not a seemly one for a lawyer.

■ The appeal in No. 90–3503 is therefore doubly frivolous—both in advancing a discredited standard for evaluating arbitrators' awards, and in failing to recognize the existence of potentially dispositive prece-

dent. The Sun–Times is entitled to an award of its attorney's fees as just damages under Rule 38 of the Federal Rules of Appellate Procedure. *Production & Maintenance Employees' Local 504 v. Roadmaster Corp.*, 916 F.2d 1161, 1163 (7th Cir.1990); *Hartz v. Friedman*, 919 F.2d 469, 475 (7th Cir.1990); *Hill v. Norfolk & Western Ry., supra*, 814 F.2d at 1202–03. It is true that in *Chicago Newspaper Publishers' Ass'n v. Chicago Web Printing Pressmen's Union No. 7, supra*, 821 F.2d at 397–98, we declined to impose sanctions on an unsuccessful challenge to an arbitration award, because it was a close case. The present case might have been made to seem close, too, if the union had followed the canonical approach, which is to argue that the arbitrator based his award on something other than his understanding of the contract. Instead it took the position that we can set aside an arbitration award if we think it an unreasonable interpretation of the contract. That is not the standard. In deciding whether to impose sanctions we must evaluate the arguments that the appellant actually made, and not the arguments it could have made. *Hartz v. Friedman, supra*, 919 F.2d at 475. The extreme approach that the union took made its appeal in No. 90–3503 frivolous.

 We move to No. 90–3501. The arbitration clause in the Main Agreement authorizes arbitration whenever there is a "disagreement" over the "interpretation or enforcement" of that agreement. The company believes that the most favored nations clause (section 7(a)) authorizes it to make any changes the union has allowed the Tribune to make. The union believes that when read in light of section 7(b), the clause just permits changes that would not impair rights granted in the Supplemental Agreement. This is in a literal sense a "disagreement" over the "interpretation" of the Main Agreement: the parties read section 7(b) differently. But the literal sense cannot be the right sense, and this for two reasons: materiality and prematurity.

1. A disagreement must be material in order to be arbitrable. The parties disagree over what section 7(b) of the existing Main Agreement means, but what the Sun–Times is proposing is a new agreement, and since the Supplemental Agreement can be modified by mutual agreement we do not see how the proposal—the final offer itself—could violate section 7(b). Neither the Main Agreement nor the Supplemental Agreement forbids proposals; and a proposal to change a provision is not a violation of the provision. The situation in No. 90–3503 was different. The Sun–Times had made changes that the union believed violated section 7(b). There are no changes in No. 90–3501—just a proposal, which until implemented can violate nothing.

2. In rejecting an earlier demand by the union to arbitrate its disagreement with the Sun–Times over the interplay between sections 7(a) and 7(b), we held that a demand triggered by nothing more than a belief—albeit a belief vindicated by subsequent events—that the Sun–Times took a different view of the question from the union did not arise from a "disagreement" within the meaning of the arbitration clause, because the clause requires more than a difference of opinion. *Chicago Typographical Union No. 16 v. Chicago Sun–Times, Inc.*, 860 F.2d 1420 (7th Cir.1988). "Disagreement" in the everyday sense is often and here continuous, and need not be public. Events giving rise to a right to compel arbitration are public and discrete manifestations of disagreement, the ripening of disagreement into actual controversy.

 The distinction is blurred by the existence of "interest arbitration": a union and employer may agree to use arbitration to determine the content of their next collective bargaining agreement in the event that negotiations between them break down. *Sheet Metal Workers Local Union No. 20 v. Baylor Heating Inc.*, 877 F.2d 547, 551–55 (7th Cir.1989); *Chicago Typographical Union No. 16 v. Chicago Newspaper Publishers' Association*, 853 F.2d 506, 509 n. 6 (7th Cir.1988); *Sheet Metal Workers Local 57 Welfare Fund v. Tampa Sheet Metal Co.*, 786 F.2d 1459 (11th Cir. 1986) (per curiam); *Sheet Metal Workers' International Ass'n v. Aldrich Air Condi-*

*tioning, Inc.,* 717 F.2d 456 (8th Cir.1983); Charles J. Morris, "The Role of Interest Arbitration in a Collective Bargaining System," 1 *Industrial Relations L.J.* 427 (1976), esp. at pp. 504–05. The breakdown of negotiations is thus the event that triggers arbitration. "Grievance arbitration" —the more common form, and the form involved in this case—is different. There the parties just agree to arbitrate disputes arising from alleged breaches of an existing collective bargaining contract. The breakdown of negotiations for a new contract is not the breach of a provision of the old contract. The employer has done nothing alleged to violate the contract, albeit its proposal for a new contract is obnoxious to the union. The parties merely take different views as to what the existing contract means. Whether their disagreement is arbitrable will therefore depend on whether the arbitration clause authorizes advisory opinions. Few arbitration clauses do. Frank Elkouri & Edna Asper Elkouri, *How Arbitration Works* 233–34 (4th ed. 1985). This one does not. Nor is it clear that the federal courts have been authorized to enforce, or for that matter to set aside, arbitrators' advisory opinions—what does it mean exactly to "enforce" a piece of advice? But we need not explore that question.

■ Actual disputes and occasions for requesting advisory opinions if such opinions are allowed pretty well divide up the world of "disagreements" arising from labor contracts, so we must decide in which bin to place the "dispute" precipitated by the Sun–Times' purportedly final offer of January 1990. We had supposed that the usual function of declaring an impasse and then laying a final offer on the table was to clear the decks for implementing the offer if and when the union rejected it; implementation, as in *Chicago Typographical Union No. 16 v. Chicago Newspaper Publishers' Association, supra,* would precipitate an actual dispute. That did not happen here. The final offer was followed not by implementation but by bargaining followed by another final offer followed by more bargaining. This has gone on for almost a year and a half. Apparently the

use of "final offers" as bargaining ploys is common. *Teamsters Local Union No. 639 v. NLRB,* 924 F.2d 1078, 1081 (D.C.Cir. 1991); *Presto Casting Co. v. NLRB,* 708 F.2d 495, 497 (9th Cir.1983). Indeed, if the company is mistaken about impasse having been reached, it cannot lawfully terminate bargaining even if it wants to. *Richmond Recording Corp. v. NLRB, supra,* 836 F.2d at 293. After final offers come more offers.

■ But we may not decide whether there was a real dispute by reference to events that occurred, or failed to occur, after the union sought to compel arbitration. With immaterial exceptions, jurisdiction is determined by the situation as it exists when suit is filed. *Johnson v. Burken,* 930 F.2d 1202, 1205 (7th Cir.1991); *FDIC v. W.R. Grace & Co.,* 877 F.2d 614, 617 (7th Cir.1989); *Julien v. Sarkes Tarzian, Inc.,* 352 F.2d 845, 846 (7th Cir.1965). In particular, jurisdiction once gained is not defeated by subsequent events (though "supplemental jurisdiction"—formerly known as pendent and ancillary jurisdiction—can be relinquished if the plaintiff's federal claim falls out early in the case). Otherwise parties could never be sure they were before a tribunal (in this case, the arbitrator) that could render a judgment in their case—the jurisdictional rug might be pulled out from under them at any time. But even discounting as we do the events subsequent to the filing of the union's suit to compel arbitration, we conclude that there was no arbitrable dispute. The final offer had been made on January 26, 1990, and implementation could have begun 48 hours later, the time required to cancel the Main Agreement unilaterally. The union did not bring suit to compel arbitration until April 9—two and a half months later. Nothing had happened in the interim—except more bargaining. This suggested that impasse had not been reached and that the so-called final offer was an interim offer, called "final" merely to command the union's attention.

■ Witney had made his arbitration award, and the Sun–Times' final offer was

cut to its pattern. In seeking arbitration to determine whether the final offer violated the Supplemental Agreement notwithstanding the most favored nations clause, the union may have been trying to mount a collateral attack on Witney's award. Such a gambit would fail if the principles of res judicata applied with full force to arbitration. In fact those principles are applied less rigorously on average in arbitration than in adjudication, because "parties to a collective bargaining agreement can elect to have rigorous rules of preclusion or lax ones." *Production & Maintenance Employees' Local 504 v. Roadmaster Corp.*, *supra*, 916 F.2d at 1162. But this is another reason not to read "disagreement" in the arbitration clause literally; otherwise the union could demand continual rearbitration of its disputes on the ground that it was still in a state of disagreement with the company over the matter in dispute.

■ The union has failed to show *why* it wanted arbitration before the company took any steps to effectuate the changes contained in the final offer. We might speculate along the following lines. If and when the company began to make the proposed changes, the Norris–LaGuardia Act would preclude the union's obtaining an injunction against the company's making them pending arbitration. *Chicago Typographical Union v. Chicago Newspaper Publishers' Ass'n*, 620 F.2d 602 (7th Cir. 1980). True, it could seek such an injunction from the arbitrator. Elkouri & Elkouri, *supra*, at 291–92. But the procedures for appointing an arbitrator may be too time-consuming to make this a worthwhile remedy. Almost certainly the procedures in the Main Agreement *are* too time-consuming. They require that the arbitrator either have the unanimous approval of a joint union-company committee or be selected from a panel submitted by the American Arbitration Association by striking names. So the making of the employer's final offer may be the latest the union can prudently wait to seek arbitration if it is to be assured of being able to obtain complete relief. But the union does not make this argument, perhaps because it acted not only too soon but also too late. For by the time it brought its suit to compel arbitration it was apparent that the final offer was not the final step before implementing changes believed by the union to violate the Supplemental Agreement; it was just a bargaining ploy. The normal give and take of bargaining, the thrusts and parries, the offers and counteroffers, do not create "disagreement" within the limited sense that the word must bear if contractual arbitration is to be kept within the boundaries intended by the parties to the contract.

We must, however, consider the bearing of our 1988 decision in the dispute between the union and the Chicago Newspaper Publishers' Association. 853 F.2d 506 (7th Cir. 1988). That was a case in which the employer(s) went ahead and implemented the final offer, allegedly in violation of the Supplemental Agreement. We held that there was an arbitrable "disagreement." Yet the grievance had been filed *before* the final offer was implemented, when the "dispute" was in the identical posture that it is in this case. The grievance *had* to have been filed before, moreover, because the (then) Main Agreement by its terms lapsed upon implementation of a final offer, and, as in our case, the only arbitration clause was in the Main Agreement. The union could not properly have filed a grievance had there not been a disagreement within the meaning of the arbitration clause at the time the grievance was filed, since the grievance is merely the first step in the arbitration process and requires, like arbitration itself, a "disagreement as to interpretation ... of the terms of this Agreement." The implication is that there was a "disagreement" *before* the final offer was implemented, since that came *after* the grievance was filed.

There is no actual conflict between the two decisions. As far as we can determine, no argument was made in *Chicago Newspaper Publishers' Association* that the grievance had been filed prematurely; nor did this court hold it had not been. The issue never arose, probably because there really was an actual dispute—once the final offer was implemented. It just may not have been a dispute that was within the

scope of any extant arbitration clause, in which event the union's remedy would have been a suit in district court under section 301 for breach of the Supplemental Agreement. Because arbitration is a more common method of resolving disputes over the meaning of collective bargaining agreements than adjudication, it was natural for the parties to disregard the expiration of the arbitration clause in the Main Agreement and to assume that if there was an actual dispute—as there surely was, but only when the final offer was implemented—the method for resolving it was arbitration. We do not read our earlier decision to hold that had there been no implementation, the disagreement over the bearing of the Supplemental Agreement on the terms of the employer's "final" offer would have been arbitrable. So read, moreover, the decision would be in tension with our other 1988 decision in this continuing saga of labor strife, the decision that found that the union's grievance was indeed premature. 860 F.2d 1420 (7th Cir.1988). It is true that the disagreement was even less focused than here, and also that our opinion suggested that questions of ripeness might be for the arbitrator, *id.* at 1425—and we do not retreat from that suggestion. But the initial question, which is one for the court, is whether the parties' contract requires arbitration in the circumstances presented. We hold that it does not.

■■■ Since the Main Agreement will by its terms lapse when and if the company implements its "really" final offer (following impasse), and since the Supplemental Agreement contains no arbitration clause, the union may be forced to go to court to enforce what it claims are its rights under that Agreement, as preserved by section 7(b) of the Main Agreement. Implementation of the final offer will bring the Main Agreement to an end, and the arbitration clause in it will die with the rest of the agreement. *Litton Financial Printing Division v. NLRB,* —— U.S. ——, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991). The final offer itself contains an arbitration provision, however. Might this commit the Sun-Times to arbitration over the union's rights

under the Supplemental Agreement, if the Sun–Times ever implements the offer? The courts are divided over the question. *United Food & Commercial Workers v. Gold Star Sausage Co.,* 897 F.2d 1022, 1026–27 (10th Cir.1990), says "no," because an implemented final offer is not contractual. *United Paperworkers International Union v. International Paper Co.,* 920 F.2d 852, 858 (11th Cir.1991), says "yes," at least if the union, by failing to call a strike, can be said to accept the offer. Our decision in *Local 106 v. Homewood Memorial Gardens, Inc.,* 838 F.2d 958, 960 (7th Cir. 1988), leans toward the Tenth Circuit's view, our decision in *United Paperworkers International Union v. Wells Badger Industries, Inc.,* 835 F.2d 701 (7th Cir.1987), toward the Eleventh Circuit's. The Supreme Court's recent *Litton* decision gives a boost to the Tenth Circuit's position by emphasizing the contractual character of an agreement to arbitrate. An implemented final offer is not contractual; it is unilateral; the whole point is that the employer is implementing an offer that the union has *not* accepted. On the other hand, the union might accept the offer, arbitration clause and all, by conduct rather than by express words, and perhaps that is all the Eleventh Circuit meant, or should be taken after *Litton* to have meant, in the *Paperworkers* case. Obviously there is no need to try to resolve the issue today.

We may bring this long opinion to a close by recalling the earlier point that the Supplemental Agreement is by its terms rescindable by the mutual agreement of the parties. Any offer by the Sun–Times to change the terms and conditions of employment in the composing term is an offer to rescind the Supplemental Agreement insofar as that agreement might bar the changes. It is, in short, a step in the negotiation of a new collective bargaining agreement. This is true whether it is a nonfinal or a final offer, for in either case it is an offer the union may decide to accept. To inject the arbitrator into the negotiation stage would be to convert grievance arbitration into interest arbitration by using the arbitrator to constrain the

negotiations. The negotiation stage is not over until the Sun–Times abandons negotiations, and this hasn't happened yet. There is not yet disagreement within the meaning of a clause that authorizes only grievance arbitration and that does not authorize either interest arbitration or advisory opinions.

The judgment in No. 90–3501 is affirmed. The judgment in No. 90–3503 is also affirmed, but with sanctions; the Sun–Times shall have fifteen days within which to submit a statement of its reasonable attorney's fees incurred in defending the appeal.