LAPINE TECHNOLOGY CORPO-
RATION, a California Corpo-
ration, Plaintiff,

v.

KYOCERA CORPORATION, a corpo-
ration organized under the laws
of Japan, Defendant.

KYOCERA CORPORATION, Plaintiff
and Counterdefendant,

v.

PRUDENTIAL–BACHE TRADE SER-
VICES, INC., formerly Prudential–
Bache Trade Corporation; Prudential
Capital & Investment Services, Inc.; La-
pine Technology Corporation; and La-
pine Holding Company, Inc. Defendants
and Counterclaimants.

Nos. C–87–20316–WAI, C–91–20159–WAI.

United States District Court,
N.D. California.

Dec. 11, 1995.

Paul H. Dawes, David A. York, Charles S. Treat; and Timothy P. Crudo, Latham & Watkins, San Francisco, CA, for Plaintiff, Defendants and Counterclaimants.

James J. Brosnahan, Kathleen V. Fisher, James F. McCabe, Tamu K. Sudduth, Morrison & Foerster, San Francisco, CA; and William E. Johnson, Spensley Horn Jubas & Lubitz, Los Angeles, CA, for Defendant, Plaintiff and Counterdefendant.

## MEMORANDUM OF DECISION

INGRAM, Senior District Judge.

### I.

### INTRODUCTION

The matters now pending before this court arise out of an arbitration conducted before a

panel of the International Court of Arbitration of the International Chamber of Commerce. Subsequent reference to the arbitrators and the sponsoring entity will be as "the Panel." The Panel bifurcated the arbitration into two segments called, respectively, Phase 1 and Phase 2. The Panel rendered a final award which included extensive findings of fact and conclusions of law. The awards of the Panel were in favor of LaPine Technology Corporation and against Kyocera Corporation. LaPine Technology Corporation, (hereinafter referred to as "LaPine"), has petitioned this court to confirm the awards of the Panel upon them; Kyocera Corporation ("Kyocera") opposes such confirmation and seeks this court's order vacating, modifying and/or correcting the awards.

This court now orders that the Application for Confirmation be granted and that an appropriate judgment in favor of Plaintiff and against Defendant, approved as to form by Defendant, be entered herein. This court further orders that the Application to Vacate, Modify and/or Correct the Awards is denied.

In the later-filed action numbered C–91–20159, Kyocera sues for a declaration that the Phase I award was not a final award and therefore not ripe for enforcement proceedings in the federal court or, in the alternative, for vacatur of the Phase I award. Claimants counterclaim for a declaration that the Phase I award was a final award and for confirmation of that award. The court finds the declaratory relief claim and counterclaim to be moot at this point and therefore dismisses them. The second counts of the claim and counterclaim, seeking vacatur and confirmation, are merged into the motions for the same relief made in Case No. C–87–20316 and are denied and granted respectively.

The foregoing disposition of the pending motions is necessitated because the court's options are limited by the provisions of the Federal Arbitration Act, 9 U.S.C. §§ 1, *et seq.* and may not be extended by agreement of the parties.

## A. *THE PARTIES*

In addition to LaPine and Kyocera, Prudential–Bache Trade Corporation ("Prudential Trade"), Prudential Capital and Investment Services, Inc. ("Prudential Capital"), and LaPine Holding Company ("LaPine Holding") are parties to the arbitration proceeding before the court, and are parties to the counterclaim in the instant action. Only LaPine and Kyocera are initial parties to the instant action.

## B. *THE FACTS*

LaPine is a corporation formed in 1984 to design, market and sell 3.5 inch Winchester disk drive devices with a ten megabyte capacity. LaPine did not have the resources and plant necessary to manufacture and market the product. At the time of its incorporation, LaPine was financed by a limited partnership, the general partner of which was an affiliate of Prudential Trade, an entity in the business of financing international business ventures. LaPine and Prudential Trade approached Kyocera suggesting that Prudential Trade would arrange the financing necessary for the manufacture of LaPine's disk drive products if Kyocera, acting as a licensee of LaPine, would manufacture the product. In November 1984 LaPine, Prudential Trade and Kyocera entered into an Agreement of Principles under the terms of which LaPine was to design and market the disk drive product, Prudential Trade was to finance the manufactured output of Kyocera which was in compliance with the schedule of product agreed upon by the parties. Prudential Trade was also obligated to provide necessary working capital related to product and to accounts receivable financing. Subsequently, in 1985, the same parties and a subsidiary of Prudential Trade executed the Trading Agreement, which covered sales of the LaPine product after its manufacture by Kyocera, and the Technology Transfer and Manufacturing Agreement, covering the licensing of LaPine technology to Kyocera.

The parties agreed that LaPine would order the disk drive product from Kyocera pursuant to a quantity and delivery schedule. A subsidiary of Prudential Trade would purchase the product from Kyocera, then resell the product at a markup to Prudential Trade which would then resell the product to LaPine on credit.

LaPine licensed to Kyocera a recently developed 3.5 inch Winchester disk drive with twenty megabyte capacity, and production commenced in late 1985. On January 18, 1986, LaPine, Kyocera and Prudential Trade, acting through its subsidiary K.K. PB Trade Corporation ("KK Trade"), entered into an agreement which provided certain actions to be taken by the parties in 1986, including an obligation on the part of KK Trade to maintain the then current level of funding of LaPine until the latter achieved "break even" status and to facilitate communication between the parties. In 1986 Kyocera experienced production problems which necessitated a shutdown of two months duration. Management problems at LaPine were encountered in 1986, which resulted in Kyocera's request for assurances that it would be paid for goods manufactured and shipped by it, pursuant to the terms of the agreements between the parties. The root of the problem was the failure of LaPine to make payments to Prudential Trade enabling the latter to pay Kyocera for goods manufactured and shipped by it. By summer of 1986 LaPine had failed to pay Prudential Trade for product delivered by Kyocera, and was insisting that Prudential Trade continue to pay Kyocera for product ordered by LaPine.

In order to bring about a refinancing and reorganization of LaPine the parties entered into negotiations to reach an agreement which would ensure both the development of LaPine and a workable commercial relationship between all the parties. In August 1986 a document entitled "Agreement in Principle" between Kyocera and Prudential Trade was forwarded by Prudential Trade to Kyocera for its consideration. This proposed agreement provided for an advance to LaPine by Prudential Trade of up to ten million dollars, secured by unfactored accounts receivable of LaPine, and that Prudential Trade would continue to buy and pay for disk drive product purchased from Kyocera for resale to LaPine. The proposed agreement contained the agreement of Kyocera to sell all LaPine products manufactured by it to Prudential Trade in accordance with a schedule of payment. The proposed Agreement in Principle also provided that all losses associated with uncollected LaPine receivables would be shared evenly by Prudential Trade and Kyocera.

On October 9, 1986, LaPine, Prudential Trade, KK Trade, the limited partnership which initially organized LaPine and Kyocera executed and delivered an Agreement in Principle which purported to restructure LaPine and to obligate the parties to negotiate the terms of a proposed Definitive Agreement ("DA"). This proposed Definitive Agreement was to be submitted to the respective boards of the corporate parties for final approval and, by its terms, was required to be signed by November 12, 1986. The proposed DA provided additionally that nothing contained in other agreements would be binding upon the parties until the execution, delivery and board approval of the Definitive Agreement.

The Agreement in Principle provided for the reorganization of LaPine by means of a "merger" by which LaPine would become the wholly owned subsidiary of LaPine Holding Company of which two-thirds of the voting stock would be owned by Prudential Trade and one-third by Kyocera. Prudential Trade and Kyocera were to be obligated to make additional capital contributions and other adjustments. While these provisions were stated to be non-binding, the Agreement in Principle contained binding provisions for the liquidation of LaPine if its operations were unsuccessful, for access to information and confidentiality, and for the selection of arbitration as the appropriate means of settling disputes arising under either the Agreement in Principle or the Definitive Agreement.

Commencing in early November 1986, revised drafts of a proposed Definitive Agreement, a proposed Financing Agreement and proposed revisions of the Trading Agreement and of the Technology Transfer and Manufacturing Agreement were prepared and circulated to counsel. On November 13, 1986, the parties completed the collection of the various signature pages to the proposed Definitive Agreement, including one purportedly signed by the chairman of Kyocera, and the DA was then filed with the California Corporations Commissioner in order to com-

ply with California law concerning corporate reorganization.

On November 14, 1986, certain revised pages of the Definitive Agreement, the Amended Trading Agreement, the Financing Agreement and the Amended Technology Transfer and Manufacturing Agreement were circulated to all parties and their counsel. Also on that date, eight signature pages for the Definitive Agreement, not including the one previously signed by Kyocera's chairman, were forwarded to Kyocera in Japan for signature and return. Those signature pages were never returned by Kyocera.

On December 17 and 18, 1986, Kyocera's attorney met with attorneys for the other parties in a "pre-closing" meeting. Kyocera's attorney at that time advised that Kyocera declined to sign the Amended Trading Agreement and the Financing Agreement prepared by Prudential Trade because those agreements provided for direct sale of manufactured product to LaPine without the intervening sales to KK Trade and Prudential Trade.

On December 18, 1986, also at the pre-closing meeting, a representative of Kyocera executed the eight copies of the signature page to the Definitive Agreement, and also executed all exhibits to the Definitive Agreement except the Amended Trading Agreement in the form proposed by Prudential Trade. On December 22, 1986, Kyocera's counsel advised the parties that although Kyocera would participate in the final closing meeting set for December 29, 1986, it would not execute and deliver the proposed Amended Trading Agreement and the Financing Agreement. On December 26, 1986, Kyocera's counsel advised the parties that Kyocera would sign a version of the Amended Trading Agreement providing that Prudential Trade remained the party responsible to pay Kyocera for disk drive product supplied by Kyocera to LaPine.

On December 29, 1986, the closing took place and all documents which constituted exhibits to the Definitive Agreement were executed and delivered between the parties except the Amended Trading Agreement. LaPine and Prudential Trade declined to sign the form of Amended Trading Agreement previously circulated by Kyocera.

By an Interim Agreement dated December 29, 1986, the parties agreed to proceed with the closing of the LaPine reorganization even though the Amended Trading Agreement had not been executed. All rights were reserved with respect to that agreement, and the parties agreed to future meetings to attempt to resolve their differences.

On December 29, 1986, counsel for LaPine and Prudential Trade gave notice by letter to Kyocera of Kyocera's breach of the Definitive Agreement by reason of Kyocera's failure to execute the Amended Trading Agreement proposed by counsel for LaPine and Prudential Trade.

On January 9, 1987, the Board of Directors of Kyocera approved its investment in LaPine under the Plan for Reorganization but did not approve the form of Amended Trading Agreement proposed by Prudential Trade.

On May 8, 1987, LaPine filed this action seeking to compel Kyocera to continue to supply drives under the terms of the Definitive Agreement. On September 2, 1987, this court granted Kyocera's motion to compel arbitration. Now before the court are LaPine's motion to confirm the arbitration award and Kyocera's motion to vacate that award.

## II.

### DISCUSSION

#### A. SCOPE OF REVIEW

As it turns out, after extensive arguments and briefing of multiple issues, the threshold issue of the scope of review is wholly determinative of these motions.

■ Kyocera places primary reliance for its position that a United States District Court, in deciding whether to confirm or to vacate an arbitration award, is bound to exercise the breadth of review provided for by the agreement between the parties upon which the arbitration is grounded upon two cases: *Fils et Cables d'Acier de Lens v. Midland Metals Corp.*, 584 F.Supp. 240 (S.D.N.Y.1984) and *Gateway Technologies,*

*Inc. v. MCI Telecommunications Corp.,* 64 F.3d 993 (5th Cir.1995). I will take up the *Fils* case first. That case is apt and strongly supports Kyocera's contention. In that case the court recognizes:

> The provision embodied in the FI-CAL/Midland contracts differs from a standard arbitration clause, however, insofar as it specifically sets forth the standard of judicial review to be applied in the event that either party seeks confirmation of an arbitration award.

*Fils, supra,* 584 F.Supp. at 242.

There, the contract provided in paragraph 13(c):

> The arbitrator shall make findings of fact and shall render an award based thereon. . . . Upon an application to the court for an order confirming such award, the court shall have the power to review (1) whether the findings of fact rendered by the arbitrator are, on the entire record of the said arbitration proceedings, supported by substantial evidence, and (2) whether as a matter of law based on said findings of fact the award should be affirmed, modified or vacated . . .

In the instant case the document providing for arbitration is the Definitive Agreement. Exhibit H to Phase 1 Findings of Fact. Section 8.10(b) of that agreement provides:

> The arbitration shall be conducted in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce ("ICC") and the Federal Arbitration Act, 9 U.S.C. sections 1 *et seq.*

Section 8.10(d) provides in part as follows:

> The arbitrators shall issue a written award which shall state the bases of the award and include detailed findings of fact and conclusions of law. The United States District Court for the Northern District of California may enter judgment upon any award, either by confirming the award or by vacating, modifying or correcting the award. The Court shall vacate, modify or correct any award: (i) based upon any of the grounds referred to in the Federal Arbitration Act, (ii) where the arbitrators' findings of fact are not supported by sub-stantial evidence, or (iii) where the arbitrators' conclusions of law are erroneous.

In *Fils, supra,* 584 F.Supp. at 243, the court confronts the question of scope of review as follows:

> The threshold question before the court is whether the parties can, by agreement, alter the nature of a federal court's role in the arbitration process. It is well settled that, in the normal case, judicial review of an arbitration award under the Federal Arbitration Act is quite limited, being confined to determining whether one of the specific grounds in 9 U.S.C. §§ 10 or 11 for vacating or modifying an award is present. [Citations omitted.] Otherwise, if the petition is properly before the Court, the Court *must* confirm the award.

The court, at 244, then states:

> Here the arbitration clause contained at § 13 of the parties' contracts alters the role of the arbitrators and the courts from those normally obtaining where the parties bargain for resort to arbitration; Paragraph 13(c) affords less weight to the decision of the arbitrator and provides for more extensive court involvement than is ordinarily the case. *However, since resort to arbitration is by itself a product of contract, there appears to be no reason, absent a jurisdictional or public policy barrier, why the parties cannot agree to alter the standard roles.* [Emphasis added.]

The court in *Fils* went on to find that the provisions of § 13 did not confer a broader species of jurisdiction upon the reviewing court, because that court had "constitutional and statutory jurisdiction" because of the diversity of the parties' citizenship, and that no public policy tenets are violated by the provisions of § 13 because, in the *Fils* case, the court's review of Findings of Fact and Conclusions of Law is "clearly a far less searching and time consuming inquiry than a full trial." *Id.* at 244.

This court disagrees with the *Fils* court on both points of its decisional justification, and, in consequence, declines to follow it.

The policies underlying arbitration are well defined in many cases and are well reflected

in the provisions of the Federal Arbitration Act, and in particular in those dealing with scope of review.

In *Chicago Typographical Union No. 16 v. Chicago Sun–Times*, 935 F.2d 1501 (7th Cir. 1991), the court said with respect to scope of review by a federal court of an arbitration award:

> [I]f the parties want, they can contract for an appellate arbitration panel to review the arbitrator's award. But they cannot contract for *judicial* review of that award; federal jurisdiction cannot be created by contract.

*Id.* at 1505.

While a court may have subject matter jurisdiction over the substance of a cause subject to arbitration, whether under diversity jurisdiction or otherwise, its power to adjudicate in the exercise of that jurisdiction, particularly where conferred by statute as here, cannot be changed or altered by the agreement of the parties. The role of the federal courts cannot be subverted to serve private interests at the whim of contracting parties.

Kyocera argues that the author of the *Chicago Typographical* opinion, Judge Posner, altered or "took back" his statements with respect to scope of review therein by his holdings in two subsequent cases. The first of these is *DDI Seamless Cylinder v. General Fire Extinguisher*, 14 F.3d 1163 (7th Cir. 1994). In that case the parties, by their agreement, converted a federal magistrate judge into an arbitrator and conferred upon him the power to render a binding award on certain issues. In disapproving this procedure, Judge Posner wrote:

> Federal statutes authorizing arbitration, such as 9 U.S.C. §§ 1 *et seq.* and 28 U.S.C. §§ 651 *et seq.*, do not appear to authorize or envisage the appointment of judges or magistrate judges as arbitrators.

*Id.* at 1165.

The court recognized that parties to judicial proceedings may agree to simplify those proceedings as in an agreement to submit a cause upon stipulated facts or by agreeing to waive argument, but found that arbitration and adjudication are modes of dispute resolution that are distinct from each other. From the totality of the holding it may be gleaned that parties may fully regulate by agreement the conduct of arbitration proceedings: they may agree to simplify the subsequent adjudicatory process by stipulation, but they may not enlarge the adjudicatory process by enlarging the limits upon it set by statute. This would amount to statutory amendment by private persons. This court finds nothing in *DDI* which is contradictory of *Chicago Typographical* on the issue of judicial review.

The second Judge Posner case said to limit or "take back" his holding in *Chicago Typographical* is *Baravati v. Josephthal, Lyon & Ross, Inc.*, 28 F.3d 704 (7th Cir.1994), which is a National Association of Securities Dealers arbitration case. There, Judge Posner says:

> Judicial review of arbitration awards is tightly limited; perhaps it ought not to be called "review" at all. By including an arbitration clause in their contract the parties agree to submit disputes arising out of a contract to a nonjudicial forum, and we do not allow the disappointed party to bring his dispute into court by the back door, arguing that he is entitled to appellate review of the arbitrators' decision.

*Id.* at 706 [citations omitted].

In that connection the court rejected a standard employed in some circuits that included a possible finding that the arbitrators exhibited a "manifest disregard of the law," saying, "[T]he grounds for setting aside arbitration awards are exhaustively stated in the statute." *Id.* The court found no reason to continue a nonstatutory supplementation such as that embodied in the "manifest disregard of the law" criteria. *Id.*

This court finds no expression in *Baravati* which can be said to limit the holding in *Chicago Typographical.*

Since the submission of this matter, Kyocera has directed the court's attention to the recent Fifth Circuit decision in *Gateway Technologies, Inc. v. MCI Telecommunications Corp.*, 64 F.3d 993 (5th Cir.1995). In that case, which reviewed an arbitration award, the parties had contractually agreed that the arbitrator's award would be final

and binding on both parties, "except that errors of law shall be subject to appeal." *Id.* at 995. The Fifth Circuit Court of Appeals held that

Because these parties contractually agreed to expand judicial review, their contractual provision supplements the FAA's default standard of review and allows for de novo review of issues of law embodied in the arbitration award.

*Id.* at 997.

The Fifth Circuit further held, at footnote 3,

Of course, the FAA would govern review of the arbitration had the contract been silent. However, the FAA does not prohibit parties who voluntarily agree to arbitration from providing contractually for a more expansive judicial review of the award. "There is no federal policy favoring arbitration under a certain set of procedural rules; the federal policy is simply to ensure the enforceability, according to their terms, of private agreements to arbitrate." *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University,* 489 U.S. 468, 469, 109 S.Ct. 1248, 1250, 103 L.Ed.2d 488 (1989).

*Id.*

The parties have consented to claimant's request that this court take judicial notice of the briefs of the parties filed in *Gateway* together with the unpublished District Court decision from which the *Gateway* appeal was taken. Judicial notice is accordingly taken.

In the opening brief of Appellant MCI at pages vi and xiii, appellant requests oral argument on the issue, *inter alia,* of whether the district court, on vacatur and confirmation proceedings can reform the parties' judicial review provision as included in the Agreement to Arbitrate; at page 4 appellant alleges that the district court refused to give effect to the parties' agreed "errors of law" standard of review; in pages 13–19 Appellant MCI argues that the district court reviewed the purported errors of law presented to it with a less strict scrutiny than that generally employed in appellate review.

In its brief Appellee Gateway, at page 12, states

Gateway does not dispute that Article 9 of the subcontract applies to this court's review of the award, nor did Gateway assert in the district court that Article 9 was inapplicable. On the contrary, Gateway has always taken the position that, whatever standard of review is applied, there is no "error of law" on which to base vacatur of the award.

In its Reply Brief, pages 1–5, Appellant MCI argues that, notwithstanding Gateway's contention that the arbitrator did follow the contractually agreed standard of review, in fact a lesser degree of scrutiny was employed.

The thrust of claimant's contention which led to the above consideration of the briefs and district court opinion is that the *Gateway* decision is without precedential value because there was no contested issue with respect to the scope of judicial review before the court, the parties being in agreement with respect to the contractual language.

It is clear, however, that there was disagreement between the parties as to the "harmless error" standard of review actually employed by the district judge, which chosen standard is simply the high end of a spectrum ranging from a refusal to accord review at all to some standard of diminished review as illustrated in the case. The Fifth Circuit Court of Appeals fully explicates its view of the scope of review as a creature of contract together with its view of the policy underlying the FAA. Irrespective of words in appellee's brief from which the absence of a contested issue can be inferred, clearly there was a contested issue. This is illustrated in appellee's brief at pages 12 and 13 where Gateway argues in support of the review accorded by the district court. This view was rejected by the Fifth Circuit Court, and the opinion of that court on the scope of review cannot be relegated to mere dictum.

The decisions in *Gateway, supra,* and *Chicago Typographical, supra,* do not jibe, are inconsistent with each other and *contra* to each other. *Gateway* deals with a situation more factually similar to that of the instant case than are the two factual configurations present in *Chicago Typographical,* but the Fifth Circuit reaches a result which, in this

court's view, is not only inconsistent with *Chicago Typographical* but also, equally importantly, with the public policy considerations (discussed below) which delineate the functions of judicial and nonjudicial decisional forums. This court does not find that such cases as *Mastrobuono v. Shearson Lehman Hutton, Inc.,* —— U.S. ——, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995) and *Volt Information Sciences, supra,* 489 U.S. 468, 109 S.Ct. 1248, which concern the powers of disputing parties to contractually specify matters pertaining to the subject matter and rules of arbitration between them, helpful because they do not deal with contractually agreed appellate review of arbitration awards. As stated in *Chicago Typographical,* the parties may contract freely with respect to the manner in which they may arbitrate their disputes, but enlargement of judicial powers of review by contract does not lie within their competence.

This court is satisfied that the parties may not by agreement alter by expansion the provisions for judicial review contained in the Federal Arbitration Act.

In addition to its citation of *Fils* and *Gateway,* and its criticism of the Posner decisions just discussed, Kyocera cites also *Advanced Micro Devices, Inc. v. Intel Corp.,* 9 Cal.4th 362, 36 Cal.Rptr.2d 581, 885 P.2d 994 (1994), wherein the California Supreme Court articulates the California Court's Scope of Review in this fashion:

Although [California Code of Civil Procedure] Section 1286.2 permits the court to vacate an award that exceeds the arbitrator's powers, the deference due an arbitrator's decision on the merits of the controversy requires a court to refrain from substituting its judgment for the arbitrator's in determining the contractual scope of those powers.

Giving substantial deference to arbitrators' own assessments of their contractual authority is consistent with the general rule of arbitral finality we recently reaffirmed in *Moncharsh v. Heily & Blase,* 3 Cal.4th [1] at 8–13 [10 Cal.Rptr.2d 183, 832 P.2d 899 (1994) ]. As we stated there, parties to private, nonjudicial arbitration typically expect "their dispute will be resolved without necessity for any contact with the courts."

The decision to arbitrate disputes is motivated in part by the desire to avoid the delay and costs of judicial trials and appeals.

*Id.* at 372–373, 36 Cal.Rptr.2d 581, 885 P.2d 994 [citations omitted].

The court also had occasion to say: "Consequently the dissent's approach would require judicial reexamination of the award's legal and factual sufficiency, an enterprise we disapproved in *Moncharsh.*" *Id.* at 390, 36 Cal.Rptr.2d 581, 885 P.2d 994.

This court finds nothing in the *AMD* majority opinion which places that case in the same camp as *Fils.*

■ On balance, this court's examination of the California cases does not suffice to compel this court to a different conclusion than that herein expressed. It is worthy of note that while arbitration is non-judicial dispute resolution, confirmation or vacation is not part of such a proceeding, but is a judicial act provided for by statute.

Section 8.10 of the Definitive Agreement expands the limits of the exercise of the subject matter jurisdiction over these alternative motions to confirm or to vacate or modify the Panel's award. The provisions of that section assume the prerogative of Congress, in that they presume to direct this court as to the substance and parameters of its exercise of judicial power.

Therefore, there is a jurisdictional barrier to the implementation of § 8.10 in the fashion that its authors intended.

■ An even more serious obstacle to the validity of § 8.10 is grounded in public policy. In *Fils* the court found that public policy was not offended by its enlargement of its statutorily granted scope of review because, although the role of the court in examining the substance of the evidence and the verity of the legal conclusions was greatly expanded by the court's enforcement of the parties' agreement, the court's task was nonetheless less time consuming and procedurally less complicated than would have been a trial. In consequence, the *Fils* court concluded, public policy in favor of arbitration as a quick and informal alternative mode of dispute resolu-

tion was not offended. While that finding may arguably have been true in the *Fils* situation, it is certainly not true in the instant case, where a court conducting its review in the fashion contemplated by § 8.10 would be conducting a replay of a fact finding process which took about four years to accomplish and produced a record of substantial magnitude, including hundreds, if not thousands, of exhibits. Judicial review of these proceedings, which were apparently unaided by the various modalities available to district courts to narrow issues and facilitate ultimate disposition, simply does not comply with the benefits usually contemplated by those who favor arbitration as an effective form of alternative dispute resolution.

It appears to this court that the contractual provisions existing in this case wherein the parties choose and specify the scope of judicial review to pertain in their arbitration is offensive to the public policy which supports arbitration and those aspects of arbitration which are beneficial to the parties as well as to the courts whose responsibilities are eased by alternative forms of dispute resolution.

### B.  *SEVERABILITY*

■ Next, the court must consider whether the unenforceability of the scope of review clause renders the entire agreement unenforceable. Kyocera is of the view that the scope of review clause as included in the Arbitration Agreement is an integral part of the arbitration provision, and there is no basis to suppose that the parties would have agreed to arbitrate at all, absent that provision.

The claimants' contention is that the scope of review comes into play only when the arbitration has concluded, and has no role in the arbitration process itself. They also argue that Kyocera would have arbitrated no matter what, rather than subject itself to the financial and liability hazard of trial by jury.

■ Generally a clause of a contract is not severable where it is an integral part of an entire contract, that is when the terms of the portion to be severed appear to be interdependent and common to the remaining terms. *Graham Oil Co. v. ARCO Products Co., a*

*Division of Atlantic Richfield Co.,* 43 F.3d 1244 (9th Cir.1994). In that case the majority, in denying severance, held that certain clauses in an arbitration agreement were blatantly illegal and were a part of an "integrated scheme" to contravene public policy. The instant case is not susceptible to such a characterization, and presents a clear cleavage in its terms between the arbitration procedure to be conducted by the arbitrators and the review of the arbitration procedure to be conducted by the court. These functions have nothing in common with respect to the manner in which the individual functions are performed.

Motivations of the parties in contracting for the defined scope of judicial review are unknown to the court and the parties offer nothing but speculative suggestion on this score.

The contents of § 8.10(d)(ii) and (iii) of the Definitive Agreement are clearly severable.

Because I find that the scope of review provisions of Section 8.10(d) are severable and since, as concluded in Part A above, no expanded review is permissible, the decision to confirm or vacate the Panel's award must turn on the statutory grounds contained in 9 U.S.C. § 10. I turn to that question in the following section.

### C.  *FEDERAL ARBITRATION ACT REVIEW*

■ At the outset the court notes that Kyocera's only argument for vacatur on the permissible statutory grounds made in its Motion to Vacate took the form of seven vague references all contained in footnotes. The substance of its FAA argument appears in its opposition to Claimants' Motion to Confirm. However, the only allowable defense to a confirmation motion is that the award is vaca*ted.* Not that the award is vaca*table.* 9 U.S.C. § 9. These arguments should have been made in the Motion to Vacate and, since they were not, they are untimely. However, in an abundance of caution, the court addresses these arguments below as an alternative ground for denial of the Motion to Vacate. None have merit.

Kyocera contends that the Panel exceeded its powers under 9 U.S.C. § 10(a)(4) by rendering an award with legal and factual error; that the Panel failed to hear pertinent and material evidence and thus deprived Kyocera of defenses to alleged formation and breaches of contract in violation of 9 U.S.C. § 10(a)(3); and that the parties did not intend to be bound by a legally erroneous and factually insufficient award, and that, if the award is unreviewable under all the provisions of § 8.10, then it was procured by undue means in violation of § 10(a)(1). For all these reasons, Kyocera contends the award should be vacated.

1. *Did The Panel Exceed Its Powers? (§ 10(a)(4))*

9 U.S.C. § 10 provides:

(a). In any of the following cases the United States court in and for the district where the award was made may make an order vacating the award upon the application of any party to the arbitration—

.   .   .   .   .

(4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter was not made.

Section 8.10(b) of the Definitive Agreement provides:

(b) *Rules.* The arbitration shall be conducted in accordance with the Rules for Conciliation and Arbitration of the International Chamber of Commerce ("ICC") and the Federal Arbitration Act, 9 U.S.C. sections 1 *et seq.*

■ Section 8.10(d) of the Definitive Agreement provides:

(d) *Manner.* A party desiring to submit a matter to arbitration shall give written notice to the other parties hereto. The arbitral tribunal shall consist of three arbitrators, who shall be United States citizens or residents. The three arbitrators shall be appointed by the Court of Arbitration of the ICC. *The arbitrators shall decide the matters submitted based upon the evidence presented, the terms of this Agreement, the Agreement in Principle and the laws of the State of California.* The arbitrators

shall issue a written award which shall state the bases of the award and include detailed findings of fact and conclusions of law. [Emphasis added.]

Kyocera contends that the Submission Agreement directs the Panel to follow the terms of agreement, and expressly denies them the power to ignore the law (the power of *amiable composituer*), and denies them the power to award relief which is beyond the scope of the parties' agreement or beyond the applicable law (the power of *ex aequo et bono* ).

Kyocera cites the Ninth Circuit case of *Western Employers Ins. Co. v. Jefferies & Co., Inc.,* 958 F.2d 258 (9th Cir.1992), in which the appellate court reversed a district court order dismissing a petition to vacate an arbitration award where the underlying arbitration agreement required the arbitrators to make findings of fact and conclusions of law, which they did not do in the rendition of their award. The court said:

By failing to provide Western with findings of fact and conclusions of law, the NASD panel clearly failed to arbitrate the dispute according to the terms of the arbitration agreement. In so doing, the panel exceeded its authority under 9 U.S.C. § 10(d) [now § 10(a)(4) ].... We therefore vacate the award.

*Id.* at 262. Kyocera argues that the Panel here admitted that it failed to base its award upon the Agreement in Principle and thus the award cannot be confirmed because the Panel failed to follow the dictates of the parties.

This case does not help Kyocera, however, because in fact the Panel *did* consider the Agreement in Principle and concluded that it was superseded by the Definitive Agreement. *See* Phase I Award, p. 69. Therefore, the Panel was not required to actually rely upon an agreement it found to be superseded. Yet, by considering the Agreement in Principle at all, it did fulfill the mandate that it "decide matters submitted based upon ... the Agreement in Principle."

■ Next, Kyocera claims that the Panel failed to base its award upon the Definitive

Agreement. In support of this contention it cites five instances where the Panel allegedly misinterpreted the terms of the DA and its subsidiary agreements. *See* Kyocera's Oppo. to Motion to Confirm, pp. 11–12. Failing to apply the agreements in the manner preferred by Kyocera does not amount to a failure to decide the matters submitted based upon the Definitive Agreement. *See National R.R. Passenger Corp. v. Chesapeake & O. Ry.*, 551 F.2d 136, 141–142 (7th Cir.1977). The court will not examine the Panel's interpretation of the agreements in a § 10 review of the award.

■ Lastly, under this subsection, Kyocera attempts to argue that the Panel misapplied California law in reaching its conclusions and thus "exceeded its power" to render an award "based upon ... the laws of California." This is nothing other than an attempt to bootstrap a "legally erroneous" standard of review. The Panel clearly did apply California law. It did not apply Texas law or Wisconsin law. Kyocera is arguing for a requirement that the Panel apply California law *without error*. The Ninth Circuit has ruled that an arbitration panel's award must be confirmed

> even in the face of "erroneous ... misinterpretations of law." ... It is not even enough that the Panel may have failed to understand or apply the law.... An arbitrator's decision must be upheld unless it is "completely irrational."

*Todd Shipyards Corp. v. Cunard Line, Ltd.*, 943 F.2d 1056, 1060 (9th Cir.1991).

There are no grounds for vacatur under 9 U.S.C. § 10(a)(4).

2. *Did the Panel Refuse to Hear Pertinent and Material Evidence? (§ 10(a)(3))*

■ Kyocera argues that the Panel departed from the arbitration provision and the terms of reference by bifurcating the issues of the existence and validity of the purported contracts from the issues of breach and fraud, thus leading to the virtual exclusion of evidence relevant and material to Kyocera's interpretation of the contracts in question.

In directing the bifurcation the Panel excluded from Phase 1 evidence those items having to do with "performance" of contracts as well as evidence concerning events which occurred "post 1986."

Kyocera claims that it was precluded from offering in Phase 2 evidence as to the meaning of contractual terms, notably the pricing provision, on the basis that such meaning had been previously determined in Phase 1, where that evidence had been rejected as well, and upon the further ground that the evidence was improperly found to be barred by the California Parol Evidence Rule.

The grounds for vacatur contained in § 10(a)(3) are these:

> Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, *or in refusing to hear evidence pertinent and material to the controversy;* or in any other misbehavior by which the rights of any party have been prejudiced. [Emphasis added.]

The briefs before this court do not identify with particularity which proffered items of evidence were rejected by the Panel. However, as the court understands it, it is Kyocera's contention that rulings of the Panel precluded its consideration of certain evidence said to be relevant and material. This court does not understand it to be contended that there was an actual refusal to hear such evidence or that Kyocera received no arbitral consideration in the making of rulings. Since there was no "refusal," there is no basis for vacatur under § 10(a)(3).

3. *Was the Award Procured By Undue Means? (§ 10(a)(1))*

■ Kyocera contends also that it is entitled to vacation of the award because it was procured by undue means.

In making this contention Kyocera relies upon 9 U.S.C. § 10(a)(1) which provides that an award procured by undue means may be vacated. Kyocera interprets the language of that section as "denying confirmation" if procured by undue means.

Kyocera claims that claimants perpetrated a fraud upon both Kyocera and the Panel by:

> – Drafting an arbitration provision expressly providing for judicial review.

— Including that same review provision in their arbitration claim.

— Executing the terms of reference which includes reference to that review provision.

— Acceding to the inclusion of that review provision in the jurisdictional statement of the Phase 1 decision.

— Representing to the Panel in Phase 2 that its decision was subject to judicial review.

Kyocera contends that if claimants' present position with respect to judicial review is accepted by the court, as it is, then each of the foregoing were false and their falsity was not discoverable prior to or during arbitration.

In *Lafarge Conseils et Etudes, S.A. v. Kaiser Cement & Gypsum Corp.,* 791 F.2d 1334 (9th Cir.1986), the Ninth Circuit sets forth the showing necessary to obtain vacatur of an arbitration award for fraud:

(1) The fraud was not discoverable upon the exercise of due diligence prior to the arbitration,

(2) The fraud was materially related to an issue in the arbitration, and

(3) The fraud is established by clear and convincing evidence.

*Id.* at 1339.

Even if the inclusion of the judicial review clause in § 8.10, and subsequent reference to it in the course of the arbitration can be classified as a species of misrepresentation, the contention that this must lead to the vacating of the award flunks the second and third elements set forth in *Lafarge.*

Furthermore, in *A.G. Edwards & Sons, Inc. v. McCollough,* 967 F.2d 1401 (9th Cir. 1992), the Ninth Circuit has said that there must be a showing that undue means caused the arbitration award to be given. There is no showing whatever, or even contention, that the scope of review clause caused the award to be given. Thus, no grounds exist for vacatur (or for denying confirmation) under 9 U.S.C. § 10(a)(1).

For the foregoing reasons this court concludes that there has been no compelling reason shown for vacatur of the award under any of the grounds specified in the Federal Arbitration Act, 9 U.S.C. § 10.

### III.

### CONCLUSION

In sum, because Kyocera's Motion to Vacate is denied for the reasons set out above, claimants' Motion to Confirm the Arbitration Award must be granted under the terms of 9 U.S.C. § 9.